**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

---

In re INTUNIV ANTITRUST LITIGATION

This Document Relates to: All Actions

---

C.A. No. 16-cv-12653-ADB (Direct)
16-cv-12396-ADB (Indirect)

**PUBLIC VERSION**

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO EXCLUDE THE OPINION AND TESTIMONY OF
<u>PLAINTIFFS' EXPERTS MARTHA A. STARR AND CHRISTOPHER F. BAUM</u>**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

LEGAL STANDARD ......................................................................................................... 2

BACKGROUND ................................................................................................................. 4

ARGUMENT ...................................................................................................................... 5

I.      DR. STARR'S OPINION ABOUT ██████████████████████
      ████████████████ ...................................................................... 5

      A.     Dr. Starr's Opinions ████████████████████████
            ████████████ Are Unreliable. ................ 5

      B.     Dr. Starr's █████████████████ Fail As Matter of Law. ......... 7

II.     DR. STARR'S OPINION ABOUT ████████████████
      ████ SHOULD BE EXCLUDED BECAUSE IT IS ███████████
      ████████ ................................................................... 7

      A.     Dr. Starr ████████████████████
            ███████████████████ .................................... 7

      B.     Dr. Starr ████████████████████████
            Rendering Her Analysis Inaccurate. ........................ 10

      C.     The Hypothetical Monopolist Test Is Inapplicable In This Context................... 15

III.    DR. BAUM'S █████████████████████████████
      , SHOULD BE EXCLUDED BECAUSE IT TOO ████████████
      ████████████ .................................................................. 17

CONCLUSION.................................................................................................................. 18

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
    306 F. Supp. 3d 610 (S.D.N.Y. 2018) ........................................................................8

*Ambit Corp. v. Delta Airlines, Inc.*,
    707 F. Supp. 2d 74 (D. Mass. 2010) .........................................................................3

*Cipollone v. Yale Indus. Prods., Inc.*,
    202 F.3d 376 (1st Cir. 2000) ....................................................................................3

*Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.*,
    79 F.3d 182 (1st Cir. 1996) ......................................................................................6

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) .............................................................................................2, 3

*Flovac, Inc. v. Airvac, Inc.*,
    817 F.3d 849 (1st Cir. 2016) ....................................................................................8

*FTC v. AbbVie, Inc.*,
    329 F. Supp. 3d 98 (E.D. Pa. 2018) ..................................................................15, 16

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ...........................................................................................7, 14

*Gomez v. Rivera Rodriguez*,
    344 F.3d 103 (1st Cir. 2003) ....................................................................................4

*In re Intuniv Antitrust Litig.*,
    No. 16-cv-12396 (D. Mass. Aug. 21, 2019) .............................................................5

*In re Nexium (Esomeprazole) Antitrust Litig.*,
    842 F.3d 34 (1st Cir. 2016) ................................................................................2, 18

*Nieves-Villanueva v. Soto-Rivera*,
    133 F.3d 92 (1st Cir. 1997) ......................................................................................3

*Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*,
    161 F.3d 77 (1st Cir. 1998) ................................................................................3, 14

*Samaan v. St. Joseph Hosp.*,
    670 F.3d 21 (1st Cir. 2012) ........................................................................2, 3, 7, 16

-ii-

*SMS Sys. Maint. Servs., Inc. v. Dig. Equip. Corp.*,
   188 F.3d 11 (1st Cir. 1999) ........................................................................................17

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
   2018 WL 563144 (D. Mass. Jan. 25, 2018) ...............................................................1, 7

*WBIP, LLC v. Kohler Co.*,
   965 F. Supp. 2d 170 (D. Mass. 2013) .........................................................................3

**Other Authorities**

Fiona Scott Morton & Margaret Kyle, *Markets for Pharmaceutical Products*, *in* 2
   Handbook of Health Economics 763 (2012) ...............................................................11

Rachel Bluth, *ADHD Numbers Are Rising, and Scientists Are Trying to
   Understand Why*, Wash. Post, Sept. 10, 2018 ...........................................................7

## INTRODUCTION

Defendants Actavis Elizabeth LLC, Actavis LLC, and Actavis Holdco U.S., Inc. (collectively "Actavis") and Shire LLC and Shire US Inc. (collectively, "Shire" and together with Actavis, "Defendants"), move to exclude the opinion and testimony of Plaintiffs' experts Martha A. Starr, Ph.D. and Christopher F. Baum, Ph.D.  To succeed on their claims under Sections 1 and 2 of the Sherman Act, Plaintiffs must prove that Shire possessed "market power" (for a Section 1 claim) or "monopoly power" (for a Section 2 claim) in the relevant market.[1]  To that end, Dr. Starr and Dr. Baum offer opinions ███████████████████████████ ████████████████████████████████  Dr. Starr further opines t██████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████

Dr. Starr's testimony should be excluded for two primary reasons.  First, she offers opinions that are not reliable, and therefore not helpful to the finder of fact.  Dr. Starr's opinions about ███████████████████████████████████████ are unreliable because they are based on incomplete data and demonstrate at most correlation, not causation.  Dr. Starr's opinion that ████████████████████████████████████████ because it leads to the absurd result that nearly every pharmaceutical company (including every producer of generic pharmaceuticals) is a monopolist—which is why this sort of "evidence" has been

---

[1] *See, e.g.*, *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2018 WL 563144, at *4 & n.5 (D. Mass. Jan. 25, 2018).  Defendants refer to "market power" throughout this memorandum because failure to demonstrate market power is *a fortiori* failure to demonstrate monopoly power.  *Id.* ("[A] showing of monopoly power for the purposes of Section 2 is held to a higher standard than for Section 1.") (citation omitted) (collecting cases).

[2] *See, e.g.*, Apr. 1, 2019 Expert Report of Martha A. Starr ¶ 9 ("Starr Report"), attached as Ex. 40A; Apr. 1, 2019 Expert Report of Christopher F. Baum p. 2 ("Baum Report"), attached as Exhibit 168A.  All citations to exhibits refer to exhibits attached to the Declaration of Joshua S. Barlow, Esq. In Support Of Defendants' Motion for Summary Judgment And Related Filings (the "Barlow Decl.").

[3] *E.g.*, Ex. 40A (Starr Report) ¶¶ 7-8.

excluded in other cases.  And Dr. Starr's 

. Second, Dr. Starr's

opinions about ███████████████████████████████████ and

Dr. Baum's ███████████████████ because the data on which Dr. Starr and

Dr. Baum rely are incomplete, and Dr. Starr admits ███████████████████████

███████████████████████. The analysis resulting from these incomplete

and inaccurate data is likewise unreliable, and should be excluded.  Dr. Starr's opinion ████████

████████████████████ should also be excluded because it too relies on incomplete

data, and because that test is inappropriate in a non-merger pharmaceutical antitrust case.

Dr. Baum's analysis relies on these same data, and his opinions therefore suffer from the

same infirmities, and should be excluded for the same reasons.

## LEGAL STANDARD

Pursuant to Federal Rule of Evidence 702, "[a] qualified expert may testify in the form of

an opinion or otherwise if: (a) the expert's . . . knowledge will help the trier of fact to understand

the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or

data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has

reliably applied the principles and methods to the facts of the case."[4]  Rule 702 "requires district

courts to 'ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to

the task at hand' before admitting it into evidence."[5]

The latter *Daubert* requirement, ensuring that the expert's testimony is relevant to the

task at hand, "seeks to ensure that there is an adequate fit between the expert's methods and [her]

---

[4] *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 31 (1st Cir. 2012) (quoting Fed. R. Evid. 702).
[5] *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 52 (1st Cir. 2016) (alteration in original) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)).

conclusions," and "addresses the problem that arises when an expert's methods . . . yield results that bear a dubious relationship to the questions on which [s]he proposes to opine."[6]  A court's *Daubert* analysis is therefore "not limited to an appraisal of an expert's credentials and techniques but also entails an examination of [her] conclusions to determine whether they flow rationally from the methodology employed."[7]  If this analysis "reveals 'that there is simply too great an analytical gap between the data and the opinion proffered,' the expert's testimony should be excluded."[8]

This inquiry is not to be undertaken lightly: "Ever since the Supreme Court decision in *Daubert* . . . , district court judges have understood that they play a vital 'gatekeeper' role in ensuring the integrity of expert testimony."[9]  "The Court must be vigilant in exercising its gatekeeper role because of the latitude given to expert witnesses to express their opinions on matters about which they have no firsthand knowledge and because an expert's testimony may be given substantial weight by the jury due to the expert's status."[10]

"The ultimate purpose of the *Daubert* inquiry is to determine whether the testimony of the expert would be helpful to the jury in resolving a fact in issue."[11]  Expert testimony to the jury about "purely legal issues" such as "the law to be applied to the resolution of the dispute before them" is "rarely admissible" since "the jury does not decide such pure questions of law" and expert testimony on these issues "is not helpful to the jury."[12]  Therefore, in accordance with

---

[6] *Samaan*, 670 F.3d at 32.
[7] *Id.*
[8] *Id.* (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see also Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998) ("[T]rial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support . . . .").
[9] *Ambit Corp. v. Delta Airlines, Inc.*, 707 F. Supp. 2d 74, 76 (D. Mass. 2010).
[10] *WBIP, LLC v. Kohler Co.*, 965 F. Supp. 2d 170, 173 (D. Mass. 2013).
[11] *Cipollone v. Yale Indus. Prods., Inc.*, 202 F.3d 376, 380 (1st Cir. 2000).
[12] *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99-100 (1st Cir. 1997).

their important gatekeeping role, "[c]ourts generally have held legal opinion testimony inadmissible under Fed. R. Evid. 702."[13]

## **BACKGROUND**

Dr. Starr opines that, ███████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Dr. Starr further opines that ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Dr. Starr used ███████ █████████████████████████████████, and she relied on ████████████ ████████████████████████████████████████████████████████████ ██████████████████

Meanwhile, Dr. Baum purports to ████████████████████████████ ████████████████████████████████████████████ From this analysis, Dr. Baum

---

[13] *Gomez v. Rivera Rodriguez*, 344 F.3d 103, 114 (1st Cir. 2003).
[14] Ex. 40A (Starr  Report) ¶ 7; *see also id.* ¶¶ 55-72.
[15] *Id.* ¶ 8; *see also id.* ¶¶ 82-103.
[16] *See, e.g., id.* ¶¶ 80, 92-96.
[17] Ex. 168A (Baum Report) ¶¶ 7-10.

concludes that ███████████████████████████████████████████████

███████████

## **ARGUMENT**

I.   **DR. STARR'S OPINION** ███████████████████████████████████████████
     ████████████.

   A.   **Dr. Starr's Opinions** ████████████████████████████████████████
        ████████████████████████████████ **Are Unreliable.**

   Dr. Starr opines ███████████████████████████████████████████████████

   ████████████████████████████████████████████ As an initial matter,

   and as discussed in detail in II.B, *infra*, Dr. Starr's analysis of price is █████████████

   ████████████████████████████████████████████████████████████████████

   ████████████████████████████████████████████████████. In fact,

   Dr. Starr herself admits ████████████████████████████████████████

   This opinion is not reliable because ██████████████████████████████████

   ████████████████████████████████████, and the Court should exclude it for

   that reason alone.  For example, as the Court noted in denying certification of an IPP class, there

   were likely "thousands" of consumers for whom the price paid for generic Intuniv was no lower

   than the price paid for brand Intuniv prior to generic entry, due to coupons.[22]  In other words, for

   those consumers *there was no price decline*.  Dr. Starr's analysis ██████████████████████,

---

[18] *Id.* p. 2.
[19] Dr. Starr testified that ████████████████████████████████████████
   ████████████████. Ex. 41 (Starr Tr.) 188.
[20] Ex. 40A (Starr Report) ¶ 64; *see also id.* ¶¶ 7, 65-66.
[21] *Id.* ¶ 66.
[22] Mem. & Order at 8 & n.5, *In re Intuniv Antitrust Litig.*, No. 16-cv-12396 (D. Mass. Aug. 21, 2019), ECF No. 230.

██████████████████████████████████████████████████. This one example highlights the unreliability of Dr. Starr's analysis.

Moreover, Dr. Starr's opinion on this point should be excluded because ████████████ ████████████████████████████████████ Dr. Starr separately opines that, ████████████████████████████████████████████████████████ ███████████ Assuming that Dr. Starr intended for this opinion to be considered together with her ██████████████████████████████, Dr. Starr's analysis is not reliable because her ██████████████████ is wholly speculative. Dr. Starr's entire conclusory analysis can be summarized in one sentence from her report: ██████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████

But this opinion simply ████████████████████████████████ ████████████████████████████████. Dr. Starr, experienced economist though she may be, ████████████████████████████████ ████████████████████████████████████. And Dr. Starr offers ██████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

---

[23] *See Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 196 (1st Cir. 1996) ("A plaintiff can . . . show direct evidence of market power []perhaps by showing actual supracompetitive prices *and* restricted output . . . .") (emphasis added). Defendants have moved for partial summary judgment on the issue of market power, in a motion submitted contemporaneously herewith. Defendants refer to the memorandum of law accompanying that motion ("Defs.' MSJ Mem.") and incorporate by reference the arguments made therein. *See* Defs.' MSJ Mem. at Part V.

[24] Ex. 40A (Starr Report) ¶¶ 7, 70-72.

[25] *Id.* ¶ 72.

[26] *Id.* ¶ 72 & Figure 5.



███████████████ In the absence of any analysis addressing other possible

explanations (such as, for example, the "steady increase in diagnoses" of ADHD over time),[28]

Dr. Starr's conclusion is unreliable and not helpful to the jury, and the Court should exclude it.[29]

And without reliable evidence of restricted output, Dr. Starr's opinion about ███████████

███████████████████████████

**B.   Dr. Starr's Other Opinions About** ████████ **Fail As A Matter of Law.**

Dr. Starr also presents opinions ███████████████████████

███████████████████████████████████

███████████████████. For both categories, the opinions

Dr. Starr proffers fail as a matter of law to establish direct evidence of market power, as

discussed in Part V of Defendants' memorandum of law in support of their motion for summary

judgment, and should be excluded on that basis.

**II.   DR. STARR'S OPINION ABOUT** ██████████████████████
**SHOULD BE EXCLUDED BECAUSE IT IS** █████████████████████.

**A.   Dr. Starr Acknowledges, But Does Not Take Into Account,** ███████
████████████████████████.

In addition to failing to present ████████████████, Dr. Starr also

fails to present ████████████ to satisfy Plaintiffs' burden to prove "market power"

to succeed on their Sherman Act claims.[31]  Proving market power through indirect (or

---

[27] *Id.* ¶ 20 ████████████████████████████████

[28] Rachel Bluth, *ADHD Numbers Are Rising, and Scientists Are Trying to Understand Why*, Wash. Post, Sept. 10, 2018, https://wapo.st/2JLT8Ey.

[29] *See, e.g.*, *Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Samaan*, 670 F.3d at 33-34 (excluding expert opinion because, among other things, "[c]orrelation is not causation" and fit between expert's methods and data was therefore inadequate).

[30] *See Solodyn*, 2018 WL 563144, at *12.

[31] *See id.* at *4 & n.5.

"circumstantial") evidence requires properly defining the relevant product market[32] by "examining both the substitutes that a consumer might employ and 'the extent to which consumers will change their consumption of one product in response to a price change in another, i.e., the cross-elasticity of demand.'"[33]

To define the relevant product market as ███████████████████████ 

███████ Dr. Starr ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ ███████████████

██████████████████████, one needs to know what the actual prices of the drugs in question are, so one can determine (for example) whether there was any actual change in the relative prices of the two products. And "hard data on cross-elasticity of demand are rare."[35] This is particularly true in the pharmaceutical industry, ████████████████████████████████████████████████████. For example, if one drug's reported list price decreased by $10, and the manufacturer of a competitor drug did not reduce its list price, but increased by $10 a rebate to a payor that is not publicly reported, then the relative prices of the two drugs have not actually changed.

The upshot is that, for cross-price-elasticity studies or similar "natural experiments" to work, knowledge of the actual prices paid by price-sensitive actors is crucial. But, as discussed below, Dr. Starr ██████████████████████████████████████████████████████████. In these

[32] *Id.* at *5.
[33] *Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849, 854 (1st Cir. 2016) (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 469 (1992)).
[34] *See, e.g.*, Ex. 40A (Starr Report) ¶¶ 54, 73.
[35] *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 306 F. Supp. 3d 610, 619 (S.D.N.Y. 2018).

circumstances, Dr. Starr's ███████████████████████ is simply unreliable because her

analyses are based on flawed, incomplete data.

     Dr. Starr acknowledges that ████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████ Dr. Starr admits ██████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████ Thus, according to Dr. Starr, ██████████

██████████████████████████████████████████████████████

████████████████████████████████████████████.

     Dr. Starr further acknowledges that ███████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████ ██████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████ █████████████████████████████

████████████████████████████████████████████████████

███████████████████

---

[36] Ex. 40A (Starr Report) ¶ 24.
[37] *Id.* ¶ 25.
[38] *Id.*; Ex. 41 (Starr Tr.) 28 (████████████████████████████████████████████
████████).
[39] Ex. 40A (Starr Report) ¶ 32.
[40] *Id.* ¶¶ 26, 32.
[41] Ex. 41 (Starr Tr.) 39.

All of these rebates, discounts, coupons, etc. are significant in the pharmaceutical industry because they affect the actual prices paid by the patient and the third-party payor.  As Dr. Starr admitted, ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████  To examine price sensitivity, one would need to look at the actual net price paid by the actors who are price sensitive, since any other measure of price would be inaccurate, and would not accurately reflect the facts. ██████████████████, and her analysis is therefore rendered unreliable by incomplete data.

**B.      Dr. Starr** ████████████████████████████████████████████,
**Rendering Her Analysis Inaccurate.**

Dr. Starr ████████████████████████████████████████████

████████████████. Dr. Starr admits that she ██████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████  Dr. Starr also admits ██████████████████████████

████████████████████  Dr. Starr, therefore, admits ██████████████████

██████████████████. Nor did Dr. Starr ██████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████

---

[42] Ex. 40A (Starr Report) ¶ 43 (emphasis added).
[43] Ex. 41 (Starr Tr.) 37.
[44] *Id.* 39.
[45] *Id.* 48-49.



██████████████████████████████████████████████████. Dr. Starr ████████████████████████████ In other words, Dr. Starr simply ████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████ Dr. Starr knew that this information was available to her and her staff through discovery.  But she chose not ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████. ██████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████ But neither of these data sources can be used to determine net prices paid by patients or third-party payors, making these price data inaccurate. Dr. Starr admits that ████████████████████████████████████████ ████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████ Dr. Starr admits ████████████████████████████████████████████████████ ██████████████████████████████████████████ Because of these exact inadequacies, various authorities—including the *Handbook on Health Economics* edited by

---

[46] *E.g., id.* 52 ████████████████████████████████████████████.
[47] *Id.* 116-17.
[48] *See id.* 74-75.
[49] *Id.* 82-83.
[50] Ex. 40A (Starr Report) ¶ 38; *see also* Ex. 41 (Starr Tr.) 85 (same).
[51] Ex. 41 (Starr Tr.) 88-89.

Plaintiffs' expert Dr. McGuire—warn that the data sets Dr. Starr used "have significant measurement error in the price variable" that make them unfit for analyzing elasticities.[52]



First, Dr. Starr purports ██████████████████████████████████████

██████████████████████████ But Dr. Starr admits █████████████████

___

[52] Fiona Scott Morton & Margaret Kyle, *Markets for Pharmaceutical Products*, *in* 2 Handbook of Health Economics 763, 790 (2012).
[53] Ex. 41 (Starr Tr.) 194.
[54] *See* Ex. 40A (Starr Report) ¶¶ 83-89 & Figure 4.
[55] *Id.* ¶ 66.
[56] Ex. 41 (Starr Tr.) 189.
[57] *See* Ex. 40A (Starr Report) ¶¶ 90-91.

██████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████ ██████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

But of course it is relevant; indeed, it is a crucial input without which the analysis simply

cannot work.  The actual prices paid by patients and third-party payors—the net prices—are

relevant because an expert's testimony must be "based on sufficient facts or data."[60]  ████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████

        █████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████ █ █████████

████████████████████████████████████████████ █ ████

██████████████████████████████████ █ ███████████████

████████████████████████████████████████████

[58] Ex. 41 (Starr Tr.) 196-197.
[59] *Id.* 197-198.
[60] Fed. R. Evid. 702(b).
[61] *See* Ex. 40A (Starr Report) ¶ 89.
[62] Ex. 41 (Starr Tr.) 52.
[63] *Id.* 196-97.

██████████ █ █████████████████████████████████████████████████████████

██████████████████████

      Knowing the actual (net) prices that patients and third-party payors paid for Kapvay is

crucial to understanding the effect of changes in guanfacine ER price on demand for Kapvay.

Dr. Starr herself admits that ████████████████████████████████████████████

████████████████████████ █ ██████████████████████████████████████████

████████████████████████████████████████████ █ ██████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████. Her

conclusion that ██████████████████████████████████████████████

████████████████████████████████████████████████████████. Such

opinion evidence, based only on Dr. Starr's "*ipse dixit*," should be excluded.[68]

      Dr. Starr's attempt to explain away these deficiencies is inadequate.  She states only ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ But here,

Plaintiffs were engaged in discovery for many months, and could have sought exactly these data

through the discovery process.  While it was Plaintiffs' right to elect, for whatever reason, not to

obtain that information, their choice not to do so does not somehow make their inadequate data

---

[64] *See id.* 62.
[65] *Id.* 72.
[66] Ex. 40A (Starr Report) ¶ 32.
[67] Ex. 41 (Starr Tr.) 39.
[68] *Joiner*, 522 U.S. at 146.
[69] Ex. 40A (Starr Report) ¶ 44 (emphasis added).

reliable.  The Court "may evaluate the data offered to support [Dr. Starr's] bottom-line opinions to determine if that data provides adequate support."[70]  Here, Dr. Starr's natural-experiment opinions are based on data that do not accurately reflect the actual prices paid by patients and third-party payors, and the Court should exclude them.

### C.   The Hypothetical Monopolist Test Is Inapplicable In This Context.

Dr. Starr opines that,  and that her analysis                  Dr. Starr purports

As an initial matter, Dr. Starr's

.  Therefore,

, Dr. Starr's results are unreliable because they are based on inaccurate data, just like the rest of her opinions about indirect evidence of market power.

Moreover, as recently explained by Judge Bartle in *FTC v. AbbVie, Inc.*,[73] the Hypothetical Monopolist Test is not an appropriate tool to use when attempting to determine the

---

[70] *Ruiz-Troche*, 161 F.3d at 81.
[71] Ex. 40A (Starr Report) ¶¶ 8, 97, 103; *see also id.* ¶¶ 98-102.
[72] *Id.* ¶ 99.
[73] 329 F. Supp. 3d 98 (E.D. Pa. 2018).

relevant product market in a non-merger pharmaceutical antitrust case.  In other words, "[t]here is no indication that the . . . test is required or even applicable in a monopolization case such as this."[74]  Judge Bartle concluded, ███████████████ (*see* II.A, *supra*), that "the pharmaceutical market functions in a unique way," because of the dynamics of who selects a given drug and who actually pays for it.[75]  Further distinguishing the pharmaceutical industry, Judge Bartle noted that the result of the applicable regulatory framework is that "AB-rated generics are often priced at a substantial discount" compared to the brand drug, which has "vastly different costs associated with launch[]."[76]  Dr. Starr ████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████

Given that generic drugs are, by design, much less expensive to develop and launch than brand drugs, and so will be priced lower than the brand, the Hypothetical Monopolist Test is not a helpful tool in this context because "application of the [test] would result in a market limited to a brand-name drug and its AB-rated generic in almost every instance."[78]  Judge Bartle therefore "reject[ed]" plaintiffs' attempt to use the Hypothetical Monopolist Test as indirect evidence of market power in the relevant product market.[79] ████████████████████████████████ ████████████████████████████████████████████████████

---

[74] *Id.* at 129.
[75] *Id.* (quoting *Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 428 (3d Cir. 2016)).
[76] *Id.* at 130.
[77] Ex. 41 (Starr Tr.) 161-162.
[78] *AbbVie*, 329 F. Supp. 3d at 130.
[79] *Id.*

 and the Court should therefore exclude Dr.

Starr's testimony.[80]

## III.   DR. BAUM'S ███████████████████████████████████████████████
████████████, SHOULD BE EXCLUDED BECAUSE IT TOO IS BASED ON ████
████████████████████████████████.

Dr. Starr also purports to ████████████████████████████████████████

███████████████████████████ Her opinion ████████████████████████████

████████████ and both Dr. Starr's and Dr. Baum's opinions regarding the relevant product market

should be excluded for the reasons already discussed ████████████████████████

████████████████████████████████████████████████████████████████

████████████████ ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████ ████████████████████████████████████

Dr. Baum purported ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████ As Dr. Baum describes, ████████████████████████████████

████████████████████████ In other words, ██████████████████████████

████████████████████████████████████████, the output (and therefore Dr.

Baum's opinions) will therefore be compromised and unreliable.[87]

---

80 *Samaan*, 670 F.3d at 32.
81 *See* Ex. 40A (Starr Report) ¶¶ 92-96.
82 *See id.*; Ex. 41 (Starr Tr.) 201.
83 Ex. 168A (Baum Report) ¶ 10; Ex. 41 (Starr Tr.) 203.
84 Ex. 41 (Starr Tr.) 203.
85 Ex. 168A (Baum Report) ¶ 9 (internal footnote omitted).
86 *Id.* ¶ 9 n.19.
87 *See SMS Sys. Maint. Servs., Inc. v. Dig. Equip. Corp.*, 188 F.3d 11, 25 (1st Cir. 1999) ("Expert opinions . . . are no better than the data and methodology that undergird them . . . .").

Dr. Baum, like Dr. Starr, 

As a source cited by Dr. Baum himself makes clear,

Dr. Baum attempts to sidestep these serious deficiencies

. In any

event, Dr. Baum is not an analyst working for a pharmaceutical company; he (like Dr. Starr) is

an expert retained by Plaintiffs, who are engaged in litigation and therefore *could have* obtained

this information through the discovery process.  It is no answer to assert that in a non-litigation

context the necessary data are not available.  In this case, the data were available.  Plaintiffs and

their experts simply chose not to obtain them.

## <u>CONCLUSION</u>

Dr. Starr's and Dr. Baum's opinions are undermined by serious deficiencies in the data

upon which they chose to rely.  This Court, "as gatekeeper, must 'ensure that there is an adequate

fit between the expert[s'] methods and [their] conclusions.'"[91]  Here, there is a disconnect

between Dr. Starr's and Dr. Baum's inputs, methodologies, and conclusions.  The Court should

exclude the opinions of Dr. Starr and Dr. Baum.

---

[88] June 24, 2019 Rebuttal Expert Report of Christopher F. Baum ¶ 11 ("Baum Rebuttal"), attached as Ex.168B.
[89] *Id.* ¶ 13.
[90] *Id.* ¶¶ 12-13.
[91] *Nexium*, 842 F.3d at 52 (quoting *Samaan*, 670 F.3d at 32).

Dated:  September 6, 2019

Respectfully submitted,

/s/  Joshua S. Barlow
Fred A. Kelly, Jr., BBO #544046
Joshua S. Barlow, BBO #667472
HAUG PARTNERS LLP
1 Post Office Square
Boston, MA 02109
Tel: (617) 426-6800
fkelly@haugpartners.com
jbarlow@haugpartners.com

Michael F. Brockmeyer, (*pro hac vice*)
David S. Shotlander, (*pro hac vice*)
HAUG PARTNERS LLP
1667 K Street, NW
Washington, DC 20006
Tel: (202) 292-1530
Fax: (202) 292-1531
mbrockmeyer@haugpartners.com
dshotlander@haugpartners.com

*Attorneys for Shire LLC
and Shire US, Inc.*

/s/ Christopher T. Holding
Christopher T. Holding (BBO# 600627)
Sarah K. Frederick (BBO# 679885)
Srikanth Reddy (BBO# 669264)
Alicia Rubio-Spring (BBO# 692640)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, Massachusetts  02210
T: 617 570-1000
F: 617 523-1231
CHolding@goodwinlaw.com
SFrederick@goodwinlaw.com
SReddy@goodwinlaw.com
ARubio-Spring@goodwinlaw.com

Aviv Zalcenstein (*pro hac vice*)
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
T: 212 813-8800
F: 212 355-3333
AZalcenstein@goodwinlaw.com

*Counsel for Actavis Elizabeth LLC, Actavis LLC,
and Actavis Holdco U.S., Inc.*

## CERTIFICATE OF SERVICE

I, Christopher T. Holding, hereby certify that on September 6, 2019, I caused a copy of the foregoing document to be served on all counsel of record for Plaintiffs via email.

/s/ Christopher T. Holding

-19-