UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  | * |  |
|---|---|---|
|  | * |  |
|  | * |  |
|  | * |  |
| In re INTUNIV ANTITRUST LITIGATION | * | Civil Action No. 1:16-cv-12653-ADB |
| (Direct Purchasers) | * |  |
|  | * |  |
|  | * |  |
|  | * |  |

## MEMORANDUM AND ORDER ON MOTION FOR CLASS CERTIFICATION

BURROUGHS, D.J.

This "pay-for-delay" or "reverse settlement" case concerns an allegedly anticompetitive settlement of patent litigation related to the ADHD drug Intuniv. Direct purchaser plaintiffs Rochester Drug Co-Operative, Inc. ("RDC") and FWK Holdings LLC ("FWK") (together, the "DPPs") bring antitrust claims on behalf of a putative class comprised of entities that purchased Intuniv (the brand name for extended release guanfacine hydrochloride) from brand Intuniv manufacturer Shire LLC and Shire U.S., Inc. (collectively, "Shire") or generic Intuniv manufacturer Actavis Elizabeth LLC, Actavis Holdco US, Inc., and Actavis LLC (collectively, "Actavis" and together with Shire, "Defendants"). The DPPs allege that Defendants improperly delayed competition for both brand Intuniv and generic Intuniv in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, causing the DPPs to pay an inflated price for Intuniv. See generally [ECF No. 140 ("Consolidated Amended Complaint" or "CAC")].

Before the Court is the DPPs' motion for class certification [ECF No. 198]. For the reasons explained herein, the motion is GRANTED in part and DENIED in part.

## I.  BACKGROUND

The allegations at issue here are set out more fully in the Court's October 10, 2017 Memorandum and Order on Defendants' motion to dismiss.  [ECF No. 92-1 at 2–8].  The Court therefore reviews only the facts relevant to class certification.

### A.  Patent Litigation and Anticompetitive Settlement

Shire manufactures and sells Intuniv, which is generally prescribed to treat ADHD. [CAC ¶¶ 21–22].  On September 2, 2009, the Food and Drug Administration ("FDA") approved Shire's New Drug Application ("NDA") for Intuniv pursuant to 21 U.S.C. § 355.  [Id. ¶ 98]. During the relevant time period, Shire held three patents that covered Intuniv (collectively, the "Intuniv Patents").  [Id. ¶¶ 99–101].  Under the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98–417, 98 Stat. 1585, commonly known as the Hatch-Waxman Act, a generic manufacturer may file an Abbreviated New Drug Application ("ANDA") to seek approval of a proposed generic version of a brand drug.  See 21 U.S.C. § 355(j).  Obtaining approval for an ANDA is easier than obtaining approval for an NDA.  See In re Loestrin 24 Fe Antitrust Litig., 814 F.3d 538, 543 (1st Cir. 2016).  In filing an ANDA to obtain approval for a generic drug, a generic manufacturer must certify that the generic does not infringe any of the patents that the brand company lists as covering the drug at issue.  See 21 U.S.C. § 355(j)(2)(A)(vii).  On December 29, 2009, Actavis became the first company to file an ANDA for a generic version of Intuniv.  [CAC ¶ 8].

The certification that Actavis filed with its ANDA constituted a constructive act of infringement, granting Shire standing to sue Actavis.  See 35 U.S.C. § 271(e)(2)(A); In re Loestrin 24 Fe, 814 F.3d at 543.  Shire subsequently filed suit pursuant to 21 U.S.C. § 355(j)(5)(B)(iii), which triggered an automatic 30-month stay of any FDA approval of ANDAs

for generic Intuniv. [CAC ¶ 10]; see In re Loestrin 24 Fe, 814 F.3d at 543. As the first filer of an ANDA, Actavis was entitled to "a 180-day period of exclusivity during which 'no other generic can compete with the brand-name drug.'" In re Loestrin 24 Fe, 814 F.3d at 543 (quoting FTC v. Actavis, 570 U.S. 136, 144 (2013)); see 21 U.S.C. § 355(j). A critical exception to that exclusivity is that the brand company can itself market an "authorized generic" during this 180-day, first-filer exclusivity period. See Sanofi-Aventis v. Apotex Inc., 659 F.3d 1171, 1175 (Fed. Cir. 2011). Shortly after Actavis filed its ANDA, several other companies including TWi Phamaceuticals, Inc. and Anchen Pharmaceuticals, Inc. (together, "Twi/Anchen") filed their own ANDAs. [CAC ¶ 9]. Shire initiated patent infringement litigations against each ANDA filer. [Id. ¶ 10].

The DPPs allege that Shire engineered a settlement with Twi/Anchen that would have allowed Twi/Anchen to release an authorized generic Intuniv under certain conditions. [Id. ¶ 11]. That settlement threatened Actavis with the prospect of competition during its valuable 180-day exclusivity period, which Actavis was eager to avoid. Shortly after the conclusion of a bench trial on Shire's claims against Actavis, the 30-month stay on Actavis' ANDA expired on October 5, 2012, and the FDA approved the application on the same day. [Id. ¶¶ 120–21, 139–40].

The DPPs argue that, at the conclusion of the bench trial on Shire's patent claims in 2012, a ruling in Actavis' favor appeared likely. [Id. ¶¶ 120–21]. Success on those claims would not, however, have guaranteed Actavis complete exclusivity from competition for its generic Intuniv during its 180-day exclusivity period given Shire's own apparent plans for an authorized generic. See [id. ¶ 141]. On April 25, 2013, before any judgment or opinion had entered on the patent claims, Shire and Actavis entered into a settlement agreement. [Id. ¶ 141]. The DPPs claim that

despite illusory terms in the settlement agreement that technically permitted Shire to launch an authorized generic directly or through an affiliate, the agreement was a thinly disguised reverse payment agreement. [Id. ¶¶ 91, 152]. According to the DPPs, Shire effectively guaranteed Actavis a full 180-day exclusivity period during which it would face no authorized generic competition. [Id. ¶¶ 148–49]. In exchange, Actavis agreed to delay its launch of generic Intuniv until December 1, 2014, thereby allowing Shire to enjoy monopoly profits for brand Intuniv in the interim. [Id. ¶¶ 149, 152]. The DPPs argue that this anticompetitive settlement agreement caused them to pay artificially inflated prices for both brand and generic Intuniv. See [id. ¶¶ 163–65].

### B. Procedural History

FWK filed this case on December 30, 2016. [ECF No. 1]. On January 11, 2017, RDC filed similar claims, and on March 1, 2017, the Court granted a joint motion to consolidate the two actions. [ECF No. 19]. RDC is a regional distributor of pharmaceuticals and FWK holds, by assignment, the antitrust claims of Frank W. Kerr Co., a former pharmaceutical wholesaler that entered bankruptcy and subsequently closed.

This consolidated action has proceeded in coordination with claims brought on behalf of a putative class of indirect purchasers of Intuniv. See Picone v. Shire U.S. Inc. (Indirect Purchaser Antitrust Class Action), No. 16-cv-12396-ADB (D. Mass.).[1] On November 1, 2018, the DPPs filed the instant motion to certify the following class:

> All persons or entities in the United States and its territories, or subsets thereof, that purchased Intuniv and/or generic Intuniv in any form directly from Shire or Actavis, including any predecessor or successor of Shire or Actavis, from October 19, 2012 through June 1, 2015 (the "Class").

---

[1] The Court denied a motion to certify a class of indirect purchasers on August 21, 2019. In re Intuniv Antitrust Litig. (Indirect Purchasers), No. 1:16-cv-12396-ADB, 2019 WL 3947262, at *9 (D. Mass. Aug. 21, 2019).

[ECF No. 198 at 1]. Excluded from the putative class are Shire, Actavis, their officers, directors, management, employees, subsidiaries, and affiliates, as well as governmental entities. [Id. at 1–2]. Defendants filed their opposition to class certification on February 12, 2019; the DPPs filed a reply on March 21, 2019; the Defendants filed a sur-reply on April 1, 2019; and the DPPs filed a final brief on April 8, 2019. [ECF Nos. 224, 234, 244, 252]. The parties' combined briefing runs 122 pages of text with 644 footnotes in undersized font and is supported by more than 2,000 pages of exhibits.

### C. Expert Reports and Class Injury

The DPPs have proffered an expert declaration from Jeffrey J. Leitzinger, Ph.D. Dr. Leitzinger opines that "there is evidence common to members of the Class which shows, with high likelihood, that all members of the class paid at least some overcharge and therefore suffered antitrust injury." [ECF No. 199-1, "Leitzinger Decl.," ¶ 23]. He notes that both the economic literature and documents reflecting the relevant companies' pricing expectations indicate that earlier entry of generic Intuniv and earlier robust generic competition would have resulted in class members paying less for Intuniv. [Id. ¶¶ 29–32]. Additionally, the observable market prices after entry of Actavis' generic Intuniv in December 2014 and the entry of four additional generics in June 2015 show that direct purchasers were able to obtain generic Intuniv at considerably less than the brand Intuniv price. [Id. ¶ 33]. By making certain assumptions about the degree and timing of the additional generic competition that might have been present in the marketplace absent Defendants' allegedly anticompetitive conduct, Dr. Leitzinger is able to

posit a range of aggregate class overcharges that the class suffered as a result of Defendants' conduct. [Id. Exs. 8a, 8b].

Defendants proffer a counter-declaration from their expert, Gregory K. Bell, Ph.D., who disagrees with Dr. Leitzinger. He opines that the putative class members operate under different business models and that FWK and RDC do not exhibit common behaviors or share common circumstances with many of the absent putative class members whom they seek to represent. [ECF No. 223-55, "Bell Decl.," ¶¶ 7–8]. As Dr. Bell notes, the putative class contains thirty wholesalers and distributors like RDC, including the "Big 3" wholesalers (AmerisourceBergen Corporation, Cardinal Health, and McKesson Corporation) who were responsible for approximately 90% of the direct purchases of Intuniv during the class period, twelve self-warehousing retail pharmacies like Walmart, five mail-order pharmacies owned by pharmacy benefit managers, and one pharmacy owned by an integrated health maintenance organization. [Id. ¶¶ 11, 47–61]. Dr. Bell states that individualized inquiries would be required to determine whether particular putative class members experienced any impact as a result of the alleged anticompetitive agreement given differences in the class members' business practices. He further asserts that at least one class member did not suffer any impact from the conduct at issue and that eight putative class members have negative damages in at least one of the four scenarios proffered by Dr. Leitzinger. [Id. ¶¶ 7–9; see Leitzinger Decl. Ex. 7].

Dr. Leitzinger responds to Dr. Bell's assertion that several class members were uninjured by arguing that Dr. Bell projects "negative overcharges" for some class members only by engaging in an apples-to-oranges comparison. [ECF No. 234-2, "Leitzinger Rebuttal Decl.," ¶¶ 17–27]. Dr. Leitzinger contends that Dr. Bell's analysis relies on the faulty assumption that because some class members paid less than the projected average expected price for Intuniv

without Defendants' anticompetitive conduct, those class members would not have been able to pay even less but-for the illegal behavior. [Id. ¶ 20–24]. The experts also disagree about certain modeling methods and which, if any, class members would have purchased generic Intuniv absent Defendants' conduct even though they did not actually purchase generic Intuniv when it became available. See [id. ¶¶ 25, 27–40].

## II.    CLASS CERTIFICATION

To obtain class certification under Federal Rule of Civil Procedure 23, a plaintiff must first satisfy the four requirements of Rule 23(a). They must demonstrate that:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These requirements "ensure[] that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 349 (2011). "The Rule's four requirements—numerosity, commonality, typicality, and adequate representation—'effectively limit the class claims to those fairly encompassed by the named plaintiffs claims.'" Id. (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 156 (1982)).

Because the Plaintiffs seek money damages, they must also satisfy Rule 23(b)(3)'s predominance and superiority requirements. See Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1053 (2016) (citing Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013)). Rule 23(b)(3) requires a showing that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "In adding predominance and superiority to the qualification-for-certification list, the

Advisory Committee sought to cover cases in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 615 (1997) (citation omitted). The DPPs must show that "the fact of [an] antitrust violation and the fact of antitrust impact [can] be established through common proof." In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6, 20 (1st Cir. 2008).

In addition to the explicit requirements of Rule 23, there is also an implicit requirement that the proposed class be ascertainable. Donovan v. Philip Morris USA, Inc., 268 F.R.D. 1, 9 (D. Mass. 2010). A class is generally ascertainable where it is defined in terms of an "objective criterion." Matamoros v. Starbucks Corp., 699 F.3d 129, 139 (1st Cir. 2012). "[I]t must be 'administratively feasible for the court to determine whether a particular individual is a member.'" Donovan, 268 F.R.D. 1, 9 (D. Mass. 2010) (quoting Kent v. SunAmerica Life Ins., 190 F.R.D. 271, 278 (D. Mass. 2000)). The class proposed here is clearly ascertainable.

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule." Wal-Mart Stores, 564 U.S. at 350. The Court must engage in a "rigorous analysis," which may involve "prob[ing] behind the pleadings" in order to decide whether certification is appropriate. Id. (quoting Gen. Tel. Co. of Sw., 457 U.S. at 160).

A.      Numerosity

Defendants argue that the proposed class is not so numerous that joinder of all members is impracticable. There is no particular number of class members that necessarily demonstrates, or must exist in order for plaintiffs to demonstrate, that joinder of all class members is

impracticable, "but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." García-Rubiera v. Calderón, 570 F.3d 443, 460 (1st Cir. 2009) (quoting Stewart v. Abraham, 275 F.3d 220, 226–27 (3d Cir. 2001)). The Court may also take into account "subjective factors" such as the "geographic location of proposed class members, the nature of the action, and matters of judicial economy." In re Nexium (Esomeprazole) Antitrust Litig., 296 F.R.D. 47, 52 (D. Mass. 2013). Determining impracticability is a matter within the sound discretion of the district court. See Advert. Specialty Nat'l Ass'n v. FTC, 238 F.2d 108, 119 (1st Cir. 1956).

Here, the putative class is comprised of forty-eight entities that purchased Intuniv directly from Defendants during the class period and then sold Intuniv to end users and downstream distributors. [Bell Decl. ¶ 47]. The class members are geographically dispersed and vary considerably in size. See [Leitzinger Decl. Exs. 5, 6]. Though the joinder of all of the class members is not completely inconceivable, it would require overcoming significant logistical hurdles and impose high transaction costs on the class members. Also, at least fourteen class members have small enough estimated damages according to Dr. Leitzinger's estimates that litigating their claims on their own might prove prohibitively expensive. [Leitzinger Rebuttal Decl. ¶ 44].

Defendants' argument that joinder is practicable rests primarily on In re Modafinil Antitrust Litigation, 837 F.3d 238 (3d Cir. 2016), where the Third Circuit held that a district court had abused its discretion in certifying a class of twenty-two direct purchasers when it considered the late stage of the litigation as relevant to its judicial economy analysis and failed to consider the motivation of the plaintiffs to proceed as joined. [ECF No. 224 at 26–29]; see In re

<u>Modafinil</u>, 837 F.3d at 259.  The larger number of putative class members here is sufficient to distinguish this case from <u>In re Modafinil</u> and renders joinder of all class members impracticable.

Defendants also argue that the class members include several affiliated entities that should not be counted separately in considering the numerosity requirement, that at least one entity should not be included at all because it suffered no impact from the conduct at issue, and that the class impermissibly groups differently situated businesses together.  [ECF No. 224 at 25–26].  Even if the Court elected to count class members in the manner Defendants propose, there would still be at least forty direct purchasers and the Court's conclusion that joinder is impracticable would be unaffected.  Further, the argument that the class impermissibly groups entities with different business models is unavailing.  Although the class members have different business models, the Court finds no conflict between RDC and the other putative class members given that they are similarly situated entities from a legal perspective and that the DPPs have offered a credible expert opinion that all class members paid inflated prices for Intuniv because of Defendants' conduct.  <u>See</u> <u>Bridgeview Health Care Ctr., Ltd. v. Clark</u>, 816 F.3d 935, 940 (7th Cir. 2016) ("The purpose of subdivision is to protect divergent interests . . . .  There is no mandate to automatically subdivide classes."); <u>In re Lidoderm Antitrust Litig.</u>, No. 14-md-02521, 2017 WL 679367, at *2, 14–15 (N.D. Cal. Feb. 21, 2017) (rejecting argument that "a class cannot be certified covering all the types of DPPs given their various market positions" and certifying a class of "national wholesalers, regional wholesalers, mail order wholesalers, hospitals, and retail pharmacies"); <u>Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.</u>, 262

F.R.D. 58, 60 (D. Mass. 2008) (certifying a direct purchaser class made up of both end users and distributors).[2]

Courts generally find that comparable classes of direct purchasers meet the numerosity requirement, and the class dynamics here are comparable to those cases. See, e.g., In re Niaspan Antitrust Litig., No. 13-md-2460, 2019 WL 3816829, at *6 (W.D. Pa. Aug. 14, 2019) (holding that joinder of forty-eight direct purchasers was impracticable after consideration of the "number of class members, judicial economy and the geographic dispersion of class members"); In re Solodyn (Minocycline Hydrochloride) Antitrust Litig., No. 14-md-02503, 2017 WL 4621777, at *4–5 (D. Mass. Oct. 16, 2017) (certifying class of forty-eight direct purchasers and holding forty-three would still satisfy the numerosity requirement); In re Nexium (Esomeprazole), 296 F.R.D. at 53 (concluding that joinder of twenty-four or twenty-nine direct purchasers was impracticable). Considering the number of class members, the geographic dispersion of the class, the economic and logistical barriers to joinder, and the interests of judicial economy, the Court finds that joinder of all class members is impracticable.

### B.    Commonality

The requirement of Federal Rule of Civil Procedure 23(a)(2) for "questions of law or fact common to the class" is easily met here. The common questions include whether Defendants

---

[2] Defendants also emphasize that the "Big 3" direct purchasers who account for approximately 90 percent of the total volume of Intuniv purchased are not present. [ECF No. 224 at 27–28]. There may well be cases in which the substantial relative size of the few class members serves to create a conflict amongst the class that could inform how a court should approach the requirements of Federal Rule of Civil Procedure 23(a). See, e.g., Valley Drug Co. v. Geneva Pharm., Inc., 350 F.3d 1181, 1196 (11th Cir. 2003) ("[I]t would not be difficult to imagine that the national wholesalers, who benefitted from the defendants' conduct, would have substantially different interests and objectives than the named representatives purporting to represent them."). Here, the Court perceives no conflict with the national wholesalers, and Defendants undercut their argument that such a conflict exists by implicitly arguing that the class members would all or nearly all join in a suit if class certification was denied. See [ECF No. 224 at 28].

unlawfully maintained a monopoly, whether the settlement agreement constituted an unreasonable restraint of trade, the quantum of damages, and numerous subsidiary issues.  See [ECF No. 198-1 at 1–2].  The Court finds that there are questions of law and fact common to the class.

### C.     Typicality

The DPPs "may establish typicality by demonstrating that '[their] claims arise from the same course of conduct that gave rise to the claims of the absent class members.'"  In re Relafen Antitrust Litig., 231 F.R.D. 52, 69 (D. Mass. 2005) (quoting Duhaime v. John Hancock Mut. Life Ins., 177 F.R.D. 54, 63 (D. Mass. 1997)).  "The 'typicality' requirement focuses less on the relative strengths of the named and unnamed plaintiffs' case than on the similarity of the legal and remedial theories behind their claims."  Id. (quoting Jenkins v. Raymark Indus., Inc., 782 F.2d 468, 472 (5th Cir. 1986)).  A plaintiff may meet the typicality requirement by showing that the "claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory.'"  Id. (quoting In re Terazosin Hydrochloride Antitrust Litig., 220 F.R.D. 672, 686 (S.D. Fla. 2004)).  Conversely, "[t]ypicality may be defeated where the class representatives are subject to unique defenses which threaten to become the focus of the litigation."  Garcia v. E.J. Amusements of N.H., Inc., 98 F. Supp. 3d 277, 288 (D. Mass. 2015) (citation and internal quotation marks omitted).

Here, the typicality requirement is met because the DPPs bring antitrust claims that arise from the same allegedly anticompetitive conduct that vests the absent class members with like claims.  Defendants argue that the DPPs have different economic interests than some class members because their business models differ, but they do not articulate a rationale for why differing business models would render the DPPs' claims atypical.  See [ECF No. 224 at 24–25].

The Court therefore finds that the DPPs' claims and the potential defenses are typical of the putative class.

### D.     Adequacy

The adequacy requirement demands that the proposed class representatives show that they "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985). An assignee may be a class representative, but whether a particular assignee is an adequate representative is a matter for "the sound discretion of the district court." Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 104 (2d Cir. 2007).

Courts do not require the class representative to be the best of all possible plaintiffs, but they nevertheless scrutinize whether some "intractable conflict" between a plaintiff and the class exists. See Matamoros, 699 F.3d at 138; Spagnola v. Chubb Corp., 264 F.R.D. 76, 95 (S.D.N.Y. 2010). Where a finding that class representatives are inadequate will "forestall class certification[,] the intra-class conflict must be so substantial as to overbalance the common interests of the class members as a whole." Matamoros, 699 F.3d at 138. Several courts have found "that a named plaintiff is an inadequate representative where there is a close personal relationship between a plaintiff and class counsel." Spagnola, 264 F.R.D. at 96 (collecting cases).

Although, in the Court's view, a close relationship between a class representative and class counsel is not necessarily problematic, a conflict arises where the class representative and

class counsel have become so financially entangled that the interests of the class representative could be perceived to differ from the interests of the class. See In re LIBOR-Based Fin. Instruments Antitrust Litig., 299 F. Supp. 3d 430, 566 (S.D.N.Y. 2018) (finding class representative inadequate where relationship with class counsel and fee arrangement raised "at least some appearance of impropriety"); In re IMAX Sec. Litig., 272 F.R.D. 138, 157 (S.D.N.Y. 2010) (finding plaintiff with close relationship to class counsel was not an adequate representative given the large pool of potential class representatives); Spagnola, 264 F.R.D. at 96 (noting that a close personal relationship with counsel is especially likely to render a class representative inadequate "where attorneys' fees will greatly exceed the class representative's recovery") (quoting Martz v. PNC Bank, N.A., No. 06-cv-1075, 2007 WL 2343800, at *5 (W.D. Pa. Aug. 15, 2007)). In addition to conflicts of interest between the class representative and the class, courts may also consider questions of credibility and "whether class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 61 (2d Cir. 2000) (citation omitted); see Spagnola, 264 F.R.D. at 95.

Here, Defendants do not challenge the adequacy of class counsel, and the Court finds that class counsel is qualified, experienced, and has and will continue to adequately represent the class. Defendants contend, however, that FWK and RDC are not adequate class representatives. See [ECF No. 224 at 16–23]. They argue that the close relationship between FWK and class counsel and the recent allegations of criminal behavior by RDC render each an inadequate class representative.

1.     FWK's Adequacy

FWK is an Illinois LLC that was formed in late 2016 to purchase antitrust claims from the bankruptcy estates of pharmaceutical wholesaler Frank W. Kerr Co.  See [ECF No. 223-93 at 12:20–23, 14:3–14].  FWK has no employees, expenses, or assets aside from its antitrust claims, and its only revenue comes from settling lawsuits.  [Id. at 14:7–24].  FWK is managed by an attorney, Thomas Kolschowsky, who spends approximately one hour a week on work connected with FWK and is not directly compensated by FWK.  [Id. at 10:9-23, 11:21–23].  Mr. Kolschowsky has not ever reviewed a budget for the litigation or responded to a discovery request, and at the time of his deposition he did not have a meaningful understanding of Frank W. Kerr's market share prior to its bankruptcy, which would be closely related to the alleged value of FWK's and the class' claims.  See [id. at 87:17–88:15; Leitzinger Rebuttal Decl. Ex. 4a].

FWK is functionally an investment vehicle that is the brainchild of class counsel Joseph M. Vanek, who approached his friend and business partner Michael Stahelin, a Chicago-area businessman who is now the sole member of FWK, with the idea of forming FWK in June 2016. [ECF No. 223-93 at 21:2–5, 32:12–14; ECF No. 234-4 ¶ 3].  Neither Mr. Stahelin nor Mr. Kolschowsky have any professional experience in the pharmaceutical industry.  [ECF No. 223-93 at 33:18–34:2].  FWK's purchase of Frank W. Kerr's antitrust claims was financed in large part with $300,000 in loans made in late November and early December 2016 by Mr. Vanek and attorneys at his law firms.  See [ECF Nos. 223-94, 223-95, 223-96, 223-97].  The interest rate on the loans was below prevailing inflation expectations at the time they were made.  See e.g., [ECF No. 223-94].  On December 20, 2016, weeks after the attorneys made the loans on terms favorable to FWK and shortly before FWK filed this lawsuit, Mr. Vanek's law firms, Vanek,

Vickers & Masini, P.C. and Sperling & Slater, P.C., with the consent of FWK, entered into a referral agreement with Hagens Berman Sobol Shapiro LLP that guaranteed Mr. Vanek's firms 10% of Hagens Berman's total fees in this matter. [ECF No. 223-105].

Considering the close relationship between FWK and class counsel and the Court's assessment that FWK is not engaged in meaningful supervision of this case, the Court is unable to conclude the FWK has shown that it is an adequate representative plaintiff. Cf. Moskowitz v. La Suisse, Societe D'Assurances sur la Vie, 282 F.R.D. 54, 62 (S.D.N.Y. 2012) (finding class representative inadequate based on their "little knowledge of this action and little involvement"). The Court sees no impropriety in the action of FWK or class counsel, but their close business and personal relationship creates significant doubts about whether FWK could or would engage in an arm's length discussion about attorney fees with class counsel. That concern is heightened because FWK's asserted share of the aggregate damages is a mere 0.3%, and as a result its recovery may prove to far less than the 10% share of Hagens Berman's fees that Mr. Vanek's firms stand to gain. Even without a direct interest in the referral agreement, the relationship between FWK and Mr. Vanek seems so close that the Court is unable to conclude that no conflict of interest is present. The Court finds that the personal, financial, and business relationship between FWK, FWK-associated individuals, and class counsel is simply too entangled and that FWK must be dismissed as a class representative, particularly considering that it is not engaged in meaningful supervision of the litigation and another class representative is available.[3]

_____

[3] Some courts have found class representatives adequate despite close relationships with class counsel where the plaintiffs had "no direct interest or likelihood of obtaining a portion of the attorney fees awarded to class counsel." Dupler v. Costco Wholesale Corp., 249 F.R.D. 29, 42 (E.D.N.Y. 2008). There is, for example, no per se rule against relatives of class counsel serving as class representatives. See id. The adequacy requirement invites district courts to consider the circumstances of the particular case. See, e.g., Shroder v. Suburban Coastal Corp., 729 F.2d

2. RDC's Adequacy

RDC is a regional wholesaler of pharmaceuticals that carries a full line of branded and generic drugs that it purchases from manufacturers like Shire and Actavis. See [ECF No. 234-14 at 150:2–151:4]. Defendants' primary argument regarding why RDC is an inadequate class representative relates to regulatory violations and alleged criminal actions undertaken by RDC and its former executives. See [ECF No. 224 at 21–24]. RDC recently entered into a deferred prosecution agreement and settled civil claims brought by the United States in connection with failures to report suspicious opioid purchases. See Stipulation and Order of Settlement and Dismissal, United States v. Rochester Drug Co-Operative, No. 19-cv-03568-LAK (S.D.N.Y. Apr. 25, 2019), ECF No. 5. Two of its former executives, including its former CEO, were also criminally charged, attracting considerable media attention. See William K. Rashbaum, For First Time, Pharmaceutical Distributor Faces Federal Criminal Charges Over Opioid Crisis, N.Y. Times (Apr. 23, 2019), https://www.nytimes.com/2019/04/23/nyregion/opioid-crisis-drug-trafficking-rochester.html.

Credibility and honest dealing, particularly in litigation, may inform a proposed class representative's adequacy. See, e.g., Spagnola, 264 F.R.D. at 95 ("[F]actors that the Court should consider to determine whether the absent class is adequately represented include: (1) whether the proposed plaintiffs are credible . . . ." (citing Savino v. Comput. Credit, Inc., 164 F.3d 81, 87 (2d Cir. 1998))). Generally, however, adequacy should "be assessed in light of" the class representative's "conduct in this or previous litigation, not based on a subjective evaluation

_____

1371, 1375 (11th Cir. 1984) (concluding that where class representative was "concerned with his future employment, . . . a court could rationally conclude that [he] would be more concerned with satisfying his employer [class counsel] than with representing the interests of the unnamed class members").

of their personal qualifications as allegedly and tenuously evidenced by their prior criminal record." Dvornikov v. Landry's Inc., No. 15-cv-13286-ADB, 2017 WL 1217110, at *10 (D. Mass. Mar. 31, 2017) (quoting Randle v. Spectran, 129 F.R.D. 386, 392 (D. Mass. 1988)).  This Court previously denied RDC's request for a protective order prohibiting Defendants from probing the allegations of criminal behavior by RDC.  In re Intuniv Antitrust Litig., No. 16-cv-12653-ADB, 2018 WL 6179510, at *2 (D. Mass. Nov. 27, 2018).  The Court found that some discovery was appropriate "where the allegedly unlawful conduct [was] close in time to the events at issue and could lead reasonable minds to question whether a potential institutional class representative has a culture of dishonesty or disrespect for the law."  Id.

Given the history of RDC, the Court views this to be a close call.  Ultimately, however, the Court accepts RDC as an adequate representative.  RDC is under new management, its conduct in this case to date seems conscientious, and there is no obvious credibility issue that will impinge on its ability to adequately represent the class.  Additionally, there does not appear to be any conflict among the class as a result of the allegations against RDC, and there is no indication that RDC has been anything but forthright with this Court or will otherwise fail to supervise and participate in this litigation.  Therefore, the Court concludes that RDC is an adequate plaintiff.

### E.      Predominance and Superiority

The DPPs must demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Individual questions are those that require "'evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for

each member to make a prima facie showing [or where] the issue is susceptible to generalized, class-wide proof.'" See Tyson Foods, 136 S. Ct. at 1045 (quoting 2 Wm. Rubenstein, Newberg on Class Actions § 4:50, at 196–197 (5th ed. 2012)).

Here, there are significant common issues of fact and law that bear both on liability and damages in this case. It is likely that, if this case proceeds to trial, the vast majority of the evidence will concern the nature of Defendants' allegedly anticompetitive conduct and its effect on the market for Intuniv. Nevertheless, Defendants argue that the DPPs have not shown "that antitrust impact is *capable* of proof at trial through evidence that is common to the class rather than individual members" and that the DPPs' proposed damages methodologies does not reflect their theory of liability. [ECF No. 224 at 29]. "To meet the predominance requirement, the party seeking certification must show that 'the fact of antitrust impact can be established through common proof' and that 'any resulting damages would likewise be established by *sufficiently* common proof.'" In re Nexium Antitrust Litig., 777 F.3d 9, 18 (1st Cir. 2015) (quoting In re New Motor Vehicles, 522 F.3d at 20). "Paying an overcharge caused by the alleged anticompetitive conduct on a single purchase suffices to show—as a legal and factual matter— impact or fact of damage." Id. at 27 (quoting Joshua P. Davis & Eric L. Cramer, Antitrust, Class Certification, and the Politics of Procedure, 17 Geo. Mason L. Rev. 969, 984–85 (2010)).

As discussed supra, Dr. Leitzinger proffers an opinion that all member of the class paid at least some overcharges for Intuniv. His opinion is based on a substantial body of academic research, government reports, economic theory, and real-world observations. See [Leitzinger Decl. ¶¶ 23–38]. This sort of proof of antitrust injury has generally been found sufficient to establish injury on a classwide basis, except when a large numbers of putative class members are uninjured. See, e.g., In re K-Dur Antitrust Litig., 686 F.3d 197, 220 (3d Cir. 2012) vacated sub

<u>nom.</u> <u>Merck & Co., Inc. v. Louisiana Wholesale Drug Co.</u>, 570 U.S. 913 (2013), <u>reinstated by</u> <u>In re K-Dur Antitrust Litig.</u>, 2013 WL 5180857 (3d Cir. Sept. 9, 2013); <u>In re Niaspan</u>, 2019 WL 3816829, at *11; <u>In re Loestrin 24 Fe</u>, No. 13-md-02472, 2019 WL 3214257, at *13 (D.R.I. July 2, 2019); <u>In re Solodyn</u>, 2017 WL 4621777, at *7; <u>see also</u> <u>In re Asacol Antitrust Litig.</u>, 907 F.3d 42, 53 (1st Cir. 2018) (common issues did not predominate where thousands of class members who were uninjured could not be picked off in a manageable, individualized process at or before trial).

Defendants argue that Dr. Leitzinger glosses over differences within the proposed class, including that several class members may have had "negative damages" and that six brand-only purchasers who continued to pay the same price for Intuniv after generic entry suffered no antitrust impact. [ECF No. 224 at 30]. The Court finds persuasive Dr. Leitzinger's explanation that Dr. Bell's calculations of negative damages for some class members are flawed in that they compare the low actual costs some class members paid for Intuniv to the projected average price that would have existed absent Defendants' conduct and then assume that the projected average price is the lowest price that any purchaser would have paid. [Leitzinger Rebuttal Decl. ¶¶ 17–23]. Although the Court leaves the question of damages to the jury, it stands to reason, as a matter of economic theory, that low paying class members would have paid even lower prices absent the conduct as issue. <u>See</u> [<u>id.</u>]. Additionally, Dr. Leitzinger has shown that every class member who purchased brand Intuniv prior to generic entry and later purchased generic Intuniv in fact paid a lower price for the generic, and that additional generic competition after Actavis' 180-day exclusivity period led to even lower generic prices. [<u>Id.</u> ¶¶ 10, 14–15 & Exs. 2, 3; Bell Decl. Exs. G, H].

As for the six brand-only purchasers, Dr. Leitzinger has explained that two of those purchasers did purchase generic Intuniv several quarters after generic entry and that the remaining four class members all stopped purchasing brand Intuniv before generic Intuniv became available, but might well have elected to purchase generic Intuniv had it become available when they were in the market for Intuniv.  [Leitzinger Rebuttal Decl. ¶¶ 24-27].  Even if Defendants intend to argue at trial that a handful of the forty-eight class members did not suffer any antitrust impact because they would not have paid less for brand Intuniv or purchased generic Intuniv if it had been available, common issues of law and fact would still predominate.  See In re Asacol, 907 F.3d at 53 ("[T]his is not a case in which a very small absolute number of class members might be picked off in a manageable, individualized process at or before trial."); In re Loestrin 24 Fe, 2019 WL 3214257, at *15 (granting class certification where, unlike In re Asacol, it might have been "borne out through the evidence at trial that there are a couple uninjured members [in a] class" with forty-seven members); see also Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 276 (2014) ("That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate.").  Dr. Leitzinger has proffered a credible opinion that the allegedly anticompetitive conduct caused all or nearly all putative class members to pay higher prices for Intuniv, and he has therebefore shown that anticompetitive impact is capable of proof that is common to the class.

Defendants next argue that the DPPs proffer two theories of liability: one which assumes the settlement agreement delayed generic entry and then effectively guaranteed no generic competition during Actavis' 180-day exclusivity period, and a second theory that assumes the agreement delayed generic entry and then merely restricted Shire's ability to grant multiple

licenses to third parties. [ECF No. 224 at 31]. This, Defendants argue, is fatal to the DPPs' motion for class certification under Comcast Corp. v. Behrend, 569 U.S. 27 (2013), where the Supreme Court held that when a court accepts one theory of liability when granting class certification, "a model purporting to serve as evidence of damages in [that] class action must measure only those damages attributable to that theory." 569 U.S. at 35. The Court concluded that "at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation." Id. (quotation marks and citations omitted). The DPPs respond that they do not have divergent theories of liability. [ECF No. 234 at 31]. For the purposes of this Memorandum and Order, the Court need only conclude, as it does, that Dr. Leitzinger's methodology is consistent with the DPPs' theory that Defendants' unlawful conduct delayed Actavis' generic launch and prevented the launch of an authorized generic during the exclusivity period. The extent to which the DPPs may, in the future, advance theories of liability that are based on only a portion of the damages asserted by their proffered methodology need not be resolved at this stage of the litigation.

Lastly, the Court finds, for the reasons discussed in the Court's numerosity analysis, that a class action is the more appropriate means to resolve this controversy. Defendants argue that individual representation and joinder is superior, but the Court concludes that joinder of all class members is impracticable and that there are numerous class members whose claims are small enough that individual litigations might prove to be prohibitively expensive. [Leitzinger Rebuttal Decl. ¶ 44]. Additionally, a class action will be the most efficient method to resolve this dispute and will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or

bringing about other undesirable results." Amchem Prods., 521 U.S. at 615 (quoting Fed. Rule

Civ. P. 23 advisory committee's note to 1966 amendment); see In re Wellbutrin XL Antitrust

Litig., No. 08-cv-2431, 2011 WL 3563385, at *16 (E.D. Pa. Aug. 11, 2011).

The Court concludes that questions of law or fact common to class members predominate

over any questions affecting only individual members and that a class action is superior to other

available methods for adjudicating the controversy.

## III.    CONCLUSION

Accordingly, the motion for class certification [ECF No. 198] is GRANTED in part and

DENIED in part.  FWK Holdings LLC is dismissed as a class representative.  Pursuant to

Federal Rule of Civil Procedure 23, the following class is certified:

> All persons or entities in the United States and its territories, or subsets thereof, that
> purchased Intuniv and/or generic Intuniv in any form directly from Shire or
> Actavis,1 including any predecessor or successor of Shire or Actavis, from October
> 19, 2012 through June 1, 2015 (the "Class").

Excluded from the Class are Shire, Actavis, and any of their officers, directors, management,

employees, subsidiaries, and affiliates, as well as governmental entities.  Rochester Drug Co-

Operative, Inc. is appointed as the class representative.  Thomas M. Sobol and Lauren Guth

Barnes of Hagens Berman Sobol Shapiro LLP are appointed as class counsel.

**SO ORDERED.**

September 24, 2019                                  /s/ Allison D. Burroughs
                                                   ALLISON D. BURROUGHS
                                                   U.S. DISTRICT JUDGE