UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| In re INTUNIV ANTITRUST LITIGATION (Direct Purchasers) | * * * * * * | Civil Action No. 1:16-cv-12653-ADB |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

This "pay-for-delay" or "reverse settlement" case arises from an alleged anticompetitive agreement between the brand and generic manufacturers of Intuniv, an ADHD medication. Defendants Shire LLC and Shire U.S., Inc. (collectively, "Shire") manufacture Intuniv, which is the brand-name for extended release guanfacine hydrochloride. Defendants Actavis Elizabeth LLC, Actavis Holdco US, Inc., and Actavis LLC (collectively, "Actavis," and, together with Shire, "Defendants") manufacture Intuniv's generic counterpart. Plaintiffs, who include both Direct Purchaser Plaintiffs ("DPPs") and Indirect Purchaser Plaintiffs ("IPPs," and, together with the DPPs, "Plaintiffs"), allege that they were forced to pay inflated prices for Intuniv due to Defendants' improper agreement to delay competition for both brand Intuniv and generic Intuniv in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2. [FWK 140].[1] Currently before the Court are Shire's motion to compel Meijer, Inc. and Meijer Distribution, Inc. (together, "Meijer"), one of the DPPs, to arbitrate its claims against Shire, [FWK 475-1], and

[1] For purposes of this memorandum and order, the Court refers to docket entries in FWK, et al. v. Shire, et al., 16-cv-12653 as "FWK [ECF No.]" and docket entries in Picone, et al. v. Shire, et al., 16-cv-12396 as "Picone [ECF No.]."

Meijer's motion to be appointed class representative for the DPPs, [FWK 485].  For the reasons

set forth below, Shire's motion to compel arbitration is <u>GRANTED</u> in part, and, in light of that

ruling, Meijer's motion to be appointed class representative is <u>DENIED</u> with leave to renew.

## I.       BACKGROUND

Because a full recitation of the factual background is unnecessary for resolution of the

instant motion, the Court will provide only the pertinent facts here.  For a more comprehensive

factual background, the Court refers the reader to its summary judgment order, [FWK 523].

### A.       Factual Background

In September 2009, the Food and Drug Administration ("FDA") approved Shire's New

Drug Application for Intuniv.  [FWK 523 at 3].  As a result, Shire was entitled to three years of

regulatory exclusivity, during which time the FDA could not approve a generic version of

Intuniv.  [<u>Id.</u>].  In December 2009, Actavis filed an Abbreviated New Drug Application

("ANDA") for a proposed generic version of Intuniv and asserted that its drug would not infringe

on Shire's patent.  [<u>Id.</u> at 4].  As the first filer of an ANDA, Actavis would have been entitled to

a 180-day period during which no other generic manufacturer could have manufactured an

Intuniv alternative.  [<u>Id.</u>].

In May 2010, Shire sued Actavis for patent infringement in the United States District

Court for the District of Delaware (the "Delaware Court"), which automatically triggered a

30-month stay of the FDA's approval of Actavis' ANDA.  [FWK 523 at 4].  After denying

Actavis' motion for summary judgment, the Delaware Court held a bench trial in September

2012.  [<u>Id.</u> at 5].  While the underlying patent litigation proceeded, Shire and Actavis engaged in

settlement negotiations.  [<u>Id.</u> at 6–9].  In April 2013, before the Delaware Court issued a

decision, Shire and Actavis settled the case.  [<u>Id.</u> at 9–10].  In broad strokes, Shire and Actavis

agreed that (1) Shire would drop the patent suit; (2) Actavis could make and market generic Intuniv beginning in December 2014; (3) Actavis would pay a 25% royalty to Shire for the first 180 days that Actavis' generic Intuniv was on the market so long as it was the only generic Intuniv on the market; and (4) Shire could not authorize or license a third party to market or sell a generic Intuniv during Actavis' 180-day exclusivity period but could, itself or via an affiliate, market a generic Intuniv during that time.  [Id. at 10].

Plaintiffs argue that this settlement agreement was anticompetitive.  See [FWK 247]. Essentially, Plaintiffs assert that the market for Intuniv would have become competitive earlier had Shire and Actavis not entered into their settlement because Actavis would have launched a generic Intuniv before December 2014 and Shire would have authorized a third-party to market a generic to compete with Actavis' generic.  [Id. ¶¶ 151–54].

### B.    Procedural Background

FWK Holdings, LLC ("FWK") filed this action on December 30, 2016, [FWK 1], and Rochester Drug Co-Operative Inc. ("RDC") filed similar claims on January 11, 2017, [Complaint, Rochester Drug Co-Operative, Inc., v. Shire LLC, No. 17-cv-10050 (D. Mass. Jan. 11, 2017), ECF No. 1].  The Court granted a joint motion to consolidate the two actions.  [FWK 19].  The case has also proceeded in tandem with the IPPs' action against Shire and Actavis arising out of the same alleged misconduct.  [FWK 343 at 4].  On September 24, 2019, the Court granted the DPPs' motion to certify the following class:

> All persons or entities in the United States and its territories, or subsets thereof, that purchased Intuniv and/or generic Intuniv in any form directly from Shire or Actavis, including any predecessor or successor of Shire or Actavis, from October 19, 2012 through June 1, 2015 (the "Class").

[FWK 343 at 23].  The Court, however, dismissed FWK as a class representative after finding that its relationship with class counsel was too entangled.  [Id. at 16].  Despite some reservations

about RDC's adequacy as a class representative, the Court permitted RDC to take on that role. [Id. at 17–18].

On March 12, 2020, RDC filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Western District of New York.  See In re Rochester Drug Co-Operative, Inc., No. 20-bk-20230 (Bankr. W.D.N.Y.).  Because of RDC's bankruptcy, Defendants moved to decertify the DPP class.  [FWK 404].  The Court granted the motion in part, finding that RDC could not adequately represent the interests of absent class members given bankruptcy-related conflicts of interest.  [FWK 456].  Nevertheless, the Court declined to decertify the class in favor of allowing motions to intervene.  [Id. at 14–15].

Meijer is a pharmacy retailer headquartered in Michigan.  [FWK 469-1 ¶ 24].  On June 2, 2020, Meijer filed a motion to intervene, [FWK 439], which Shire opposed, [FWK 449].  On July 24, 2020, the Court granted Meijer's motion to allow the parties to engage in limited discovery to "evaluate Meijer's adequacy as a class representative."  [FWK 462 at 20].  A few days later, Meijer filed an intervenor complaint.  [FWK 469-1].  According to Meijer, it "purchased generic Intuniv directly from Actavis . . . during the class period and is the assignee of the antitrust claims of the Frank W. Kerr Company and McKesson Corp., which purchased branded Intuniv from Shire . . . during the class period."  [FWK 469-1 ¶ 24].

On August 28, 2020, Shire moved for an order compelling Meijer to arbitrate its claims against Shire.  [FWK 475-1].  On September 8, 2020, Meijer filed a motion to be appointed the DPPs' class representative.  [FWK 485].  The parties subsequently filed oppositions, replies, and sur-replies.  [FWK 496-1 (opposition to motion to compel); FWK 503-1 (opposition to motion to be appointed class representative); FWK 511-1 (motion to compel reply) FWK 526-1 (motion to

be appointed class representative reply); FWK 536-2 (motion to be appointed class

representative sur-reply)].  Both motions are fully briefed.

## II.      MOTION TO COMPEL ARBITRATION

Shire argues that Meijer entered agreements that require it to arbitrate its claims against

Actavis and, because of the doctrine of equitable estoppel, it must therefore also arbitrate its

related claims against Shire.[2]  See [FWK 477-1].  Shire asserts that equitable estoppel applies for

two independent reasons.  First, because Meijer's "claims [against Shire] arise from and are

directly related to the [a]greements [Meijer] entered into with Actavis to purchase, *inter alia*,

generic Intuniv" and those agreements contain arbitration clauses.  [Id. at 23–25].  Second,

because Meijer's claims against Shire and Actavis "turn on the same factual and legal issues,"

Meijer is bound by contract to arbitrate its claims against Shire.  [Id. at 25–27].  Shire further

maintains that because the arbitration agreements at issue delegate the threshold question of

arbitrability to the arbitrator, the Court must dismiss Meijer's complaint, or stay the litigation,

until an arbitrator decides whether Meijer must arbitrate.  [Id. at 27].

In opposition, Meijer maintains that Shire has waived any right to arbitration, and further,

that Shire's equitable estoppel argument, an issue to be decided by the Court, fails for a number

of reasons.  See [FWK 496-1].

In its reply brief, Shire asserts that the arbitrator must decide whether Shire has waived its

right to arbitrate, that, in any event, it has not waived its right to arbitrate because it sought

---

[2] Actavis has never sought to compel arbitration of any of the DPP's claims.  On December 9, 2020, the Court approved the DPPs' settlement with Actavis.  [FWK 551].  That settlement does not resolve any claims against Shire or the IPPs' claims against Actavis, though the IPPs recently informed the Court that they have reached a settlement with Actavis.  [FWK 546].

arbitration promptly after discovering that the right existed, and that it can properly invoke the doctrine of equitable estoppel.  [FWK 511-1].

### A.   The Arbitration Agreements

Shire identifies two agreements that it believes require Meijer to arbitrate its claims against Shire.  [FWK 477-1 at 11–15].

First, in July 2008, Meijer entered into a Retail Purchase Agreement ("RPA") with Watson Pharma, Inc. ("Watson"), pursuant to which Watson agreed to sell certain generic drugs at specified prices to Meijer.  [FWK 476-1].  Watson merged with Actavis in October 2012, with Actavis as the surviving company.  See [FWK 477-1 at 11 (citing Actavis plc, Annual Report (Form 10-K) at 3 (Feb. 25, 2014))].  Although generic Intuniv was not among the generic drugs originally covered by the RPA, the parties amended the product list to include it in November 2014.  See [FWK 476-3].  The RPA contains the following "Disputes and Arbitration" section:



[FWK 476-1 at 6–7].

Second, in 2017, Teva USA ("Teva") and various affiliates entered into a Generic Products Purchase Agreement ("GPPA") with The Buyers Consortium, LLC (the "BC"), whereby members of the BC agreed to purchase certain drugs, including generic Intuniv, from Teva in particular quantities and at particular prices. [FWK 476-4 at 2, 24]. Both Actavis and Teva are wholly-owned indirect subsidiaries of Teva Pharmaceutical Industries Limited. See [ECF Nos. 55, 256]. In May 2020, Meijer became a member of the BC. [FWK 476-5]. The GPPA contains the following arbitration provisions:





[FWK 476-4 at 14–15].

**B.    The Arbitrator Determines Arbitrability**

Shire asserts that under both the RPA and GPPA, the determination of arbitrability, including whether Meijer's claims against Shire are covered by the arbitration provisions and whether Shire can invoke the doctrine of equitable estoppel to compel Meijer to arbitrate, has been delegated to the arbitrator.  [FWK 477-1 at 9 n.2, 18–20].  Meijer responds that it is the

Court's job to assess whether Shire, a non-signatory to the agreements, can force Meijer to arbitrate.  [FWK 496-1 at 18–20].

Shire's argument rests on that fact that each of the two agreements incorporates the rules of the American Arbitration Association (the "AAA").  The RPA states that ███████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████  [FWK 476-1 at 6].  Similarly, the GPPA states that ████████████████████ ████████████████████████████████████████████████ ██████████████████  [FWK 476-4 at 14].  Rule 7(a) of the current AAA's Commercial Arbitration Rules and Mediation Procedures ("Commercial Rules") states that the "arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."  American Arbitration Association, Commercial Rules and Mediation Procedures, Rule 7(a) (2013).

Recently, the Supreme Court stated that

> [w]hen the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract.  In those circumstances, a court possesses no power to decide the arbitrability issue.  That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless.

Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 529 (2019). Although the Supreme Court did not decide whether the specific contract at issue in that case delegated the question of arbitrability, it did clearly establish that courts must respect delegations of arbitrability.  Id. at 531.

The Supreme Court has also cautioned, however, that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clea[r] and unmistabl[e] evidence that

they did so." First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995) (second and third

alterations in original) (internal quotation marks omitted) (quoting AT&T Techs., Inc. v.

Commc'ns Workers of Am., 475 U.S. 643, 649 (1986)).  Although the Supreme Court has not

taken a position on whether the incorporation of the AAA's rules is clear and unmistakable

evidence of intent to delegate arbitrability,[3] the federal courts of appeals, including the First

Circuit, have consistently (and recently) concluded that it does.  See Awuah v. Coverall N. Am.,

Inc., 554 F.3d 7, 11 (1st Cir. 2009) ("Rule 7(a) . . . is about as clear and unmistakable as

language can get, meeting the standard we have followed." (internal quotation marks omitted));

see also Mendoza v. Fred Haas Motors, Ltd., 825 F. App'x 200, 202 (5th Cir. 2020)

("Incorporating the [AAA] rules into the agreement 'presents clear and unmistakable evidence

that the parties agreed to arbitrate arbitrability.'" (quoting Petrofac, Inc. v. DynMcDermott

Petrol. Operations Co., 687 F.3d 671, 675 (5th Cir. 2012))); Blanton v. Domino's Pizza

Franchising LLC, 962 F.3d 842, 846 (6th Cir. 2020); Richardson v. Coverall N. Am., Inc., 811 F.

---

[3] On remand in Henry Schein, the Fifth Circuit concluded that the parties' contract, which
incorporated the AAA's rules, did not delegate arbitrability of the claims at issue because there
was a carve-out in the arbitration clause for actions seeking injunctive relief.  Henry Schein, Inc.
v. Archer & White Sales, Inc., 935 F.3d 274, 281–82 (5th Cir. 2019).  The Fifth Circuit noted,
however, that, in the absence of such a carve-out, incorporation of the AAA's rules is evidence
of intent to arbitrate arbitrability.  Id. at 279–81.  Both parties sought further Supreme Court
review, Schein regarding the Fifth Circuit's holding with respect to the contractual carve-out
provision, see Cert. Pet., Henry Schein, Inc. v. Archer and White Sales, Inc., No. 19-963, 2020
WL 529195, at *I (Jan. 31, 2020), and Archer and White regarding whether incorporation of the
AAA's rules is clear and unmistakable evidence of intent to arbitrate arbitrability, see
Conditional Cross-Pet., Archer and White Sales, Inc. v. Henry Schein, Inc., No. 19-1080, 2020
WL 1391910, at *I (Mar. 2, 2020).  The Supreme Court granted Schein's petition, see Henry
Schein, Inc. v. Archer and White Sales, Inc., 141 S. Ct. 107 (2020), but denied Archer and
White's, see Archer and White Sales, Inc. v. Henry Schein, Inc., 141 S. Ct. 113 (2020),
suggesting that it was not troubled by the state of the law regarding the significance of
incorporating the AAA's rules.  After oral argument regarding the issue raised in Schein's
appeal, the Supreme Court dismissed the writ of certiorari as improvidently granted.  Henry
Schein, Inc. v. Archer and White Sales, Inc., No. 19-963, 2021 WL 231537, at *1 (Jan. 25,
2021).

App'x 100, 103 (3d Cir. 2020); <u>Dish Network L.L.C. v. Ray</u>, 900 F.3d 1240, 1246 (10th Cir.

2018); <u>Brennan v. Opus Bank</u>, 796 F.3d 1125, 1130 (9th Cir. 2015); <u>Fallo v. High-Tech Inst.</u>,

559 F.3d 874, 878 (8th Cir. 2009); <u>Contec Corp. v. Remote Sol., Co., Ltd.</u>, 398 F.3d 205, 208

(2d Cir. 2005); <u>Terminix Int'l. Co., LP v. Palmer Ranch Ltd. P'ship</u>, 432 F.3d 1327, 1332 (11th

Cir. 2005).  Thus, because the RPA and GPPA incorporate the AAA's Commercial Rules, they

both delegate the authority to determine arbitrability to the arbitrator.[4]

 Meijer asserts that the Court, not the arbitrator, should nevertheless determine

arbitrability here because Meijer did not contract with Shire and therefore could not have agreed

with Shire to delegate the arbitrability determination.  [FWK 496-1 at 18–20].

 The First Circuit addressed this issue in <u>Apollo Comput., Inc. v. Berg</u>.  886 F.2d 469 (1st

Cir. 1989).  In that case, Apollo and Dico entered into a contract whereby Dico would distribute

Apollo's computers in a handful of countries overseas.  <u>Id.</u> at 470.  The contract contained an

arbitration clause that incorporated by reference the rules of the International Chamber of

Commerce (the "ICC").  <u>Id.</u> at 473.  The ICC's rules, like the AAA's, give the arbitrator the

authority to decide arbitrability.  <u>Id.</u>[5]  Dico filed for bankruptcy and its trustee assigned its rights

---

[4] In their briefing, the parties reference Delaware state law because both the RPA and the GPPA contain Delaware choice of law provisions, <u>see</u> [FWK 476-1 at 6; FWK 476-4 at 17], but federal law governs whether a contract evidences an intent to arbitrate arbitrability, <u>see</u> <u>Blanton</u>, 962 F.3d at 846–47.  In any event, under Delaware law, the conclusion is the same.  <u>James & Jackson, LLC v. Willie Gary, LLC</u>, 906 A.2d 76, 80 (Del. 2006) ("As a matter of policy, we adopt the majority federal view that reference to the AAA rules evidences a clear and unmistakable intent to submit arbitrability issues to an arbitrator.").

[5] Specifically, they provide that

 [s]hould one of the parties raise one or more pleas concerning the existence or validity of the agreement to arbitrate, and should the [Court of Arbitration of the ICC] be satisfied of the *prima facie* existence of such an agreement, the [Court of Arbitration of the ICC] may, without prejudice to the admissibility or merits of the

under the contract with Apollo to third parties.  Id. at 470.  Those third-party assignees filed suit against Apollo and sought to compel arbitration before the ICC.  Id.  Apollo objected, arguing that it did not agree to arbitrate arbitrability with Dico's assignees because, among other reasons, the contract had been terminated and the assignment itself violated its terms.  Id. at 472.  The First Circuit did not reach the merits of Apollo's arguments because it found that "the parties contracted to submit issues of arbitrability to the arbitrator."  Id.  It further reasoned that whether the nonsignatory assignees could enforce the arbitration agreement against Apollo was an issue that involved the existence and validity of the arbitration agreement and therefore fell within the arbitrator's purview under the ICC rules because neither party contested the arbitration agreement's *prima facie* existence.  Id. at 473–74.

Although Apollo involved an assignment (as opposed to an attempt to invoke the equitable estoppel doctrine) and the ICC's rules (as opposed to the AAA's), the Court, in the absence of any binding authority directly on point, finds the First Circuit's holding instructive. Further, the Court sees no reason to draw a distinction between assignment and estoppel for present purposes given that they are each basic common-law principles that permit non-signatories to enforce arbitration agreements.  See GE Energy Power Conversion Fr. SAS, Corp. v. Outokumpu Stainless USA, LLC, 140 S. Ct. 1637, 1643–44 (2020) ("The traditional principles of state law that apply under Chapter 1 [of the Federal Arbitration Act] include doctrines that authorize the enforcement of . . . arbitration agreements  . . . by nonsignatories

---

plea or pleas, decide that the arbitration shall proceed.  In such a case, any decision as to the arbitrator's jurisdiction shall be taken by the arbitrator himself.

Apollo, 886 F.2d at 473 (alterations in original).

through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." (internal citations and quotation marks omitted)).

Here, Meijer does not contest the *prima facie* existence of either the RPA or the GPPA or their arbitration provisions.  See generally [FWK 496-1].  Accordingly, because both the RPA and the GPPA delegate the arbitrability determination to the arbitrator, it is for an arbitrator, rather than the Court, to decide whether nonsignatory Shire can compel Meijer to arbitrate its claims.

The Court recognizes that courts within this district have reached different conclusions notwithstanding Apollo.  Compare Visibility Corp. v. Schilling Robotics, LLC, No. 10-cv-12280, 2011 WL 5075816, at *4–5 (D. Mass. Oct. 25, 2011) (citing Apollo and concluding that it "squarely addressed" the question of whether nonsignatories can compel a signatory to arbitrate the issue of arbitrability), with Tissera v. NRT New Eng., 438 F. Supp. 3d 115, 123–24 (D. Mass. 2020) (undertaking equitable estoppel analysis despite delegation provision), and Barbosa v. Midland Credit Mgmt., Inc., No. 18-cv-11997, 2019 WL 3781629, at *4 (D. Mass. July 3, 2019) (not discussing Apollo and finding that as a matter of contract law, a contractual clause delegating the arbitrability determination is applicable only to parties to the agreement and therefore, even where an arbitration provision "contains a delegation clause as to the 'applicability' of the arbitration provision, th[e] court is still tasked with evaluating whether the defendants fall within the terms of the provision at all"), report and recommendation adopted, 2019 U.S. Dist. LEXIS 135603 (D. Mass. Aug. 9, 2019), aff'd 981 F.3d 82 (1st Cir. 2020).[6]

---

[6] In its opinion, the First Circuit addressed whether the district court erred in deciding the issue of arbitrability instead of deferring to the arbitrator:

> One final issue bears mentioning because the parties have addressed it in their briefs
> and it was the subject of some interest during oral argument.  MCM attempted to

Further, as the parties' briefs reflect, courts outside Massachusetts have also taken varying views.

Compare GNH Grp., Inc. v. Guggenheim Holdings, L.L.C., No. 19-cv-01932, 2020 WL

---

convince the district court that Barbosa's arguments against compelling arbitration of her claims are actually questions of arbitrability that fall under the arbitration provision's delegation clause.  Among many details, the arbitration provision also states "[c]laims regarding the applicability of this arbitration clause or the validity of the entire Agreement, shall be resolved exclusively and finally by binding arbitration under the rules and procedures of the arbitration Administrator selected at the time the Claim is filed."  MCM says this delegation clause clearly handed the decision of whether MCM had the authority to invoke the arbitration provision to an arbitrator.  The district court disagreed and reminded MCM that, according to this Court, questions about whether an arbitration provision binds a party that did not sign the agreement are presumptively for the court to decide.

Before us, MCM argues that the district court got it wrong on this point because the Cardmember Agreement required the arbitrator, not the court, to decide whether MCM could compel arbitration, and the district court can't ignore that language within the arbitration provision. MCM urges us to consider sending the entire question of whether it has the authority to invoke the arbitration provision to an arbitrator.  In her reply, Barbosa of course disagrees and argues the district court got it right.

We have previously acknowledged that parties may agree to have an arbitrator decide not only the merits of a particular dispute but also gateway questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy [but they] must do so . . . by clear and unmistakable evidence.  We employ a presumption, however, that courts (instead of arbitrators) resolve gateway disputes about whether a particular arbitration clause binds parties in a particular case, especially when the dispute centers on whether an arbitration contract binds parties that did not sign the agreement.  In our view, the language in the arbitration provision stating that "the applicability of this arbitration clause . . . shall be resolved . . . by binding arbitration," does not provide the clear and unmistakable evidence that the parties intended an arbitrator to determine whether the parties attempting to enforce the arbitration provision had the requisite authority to do so.  The district court properly decided this issue.

Barbosa, 981 F.3d at 93 n.13 (alterations in original) (internal citations and quotation marks omitted).  Because, unlike in that case, the delegation of arbitrability here is clear and unmistakable, the First Circuit's decision in Barbosa does not compel the Court to reach a different conclusion.  In other words, although the presumption that a court should decide arbitrability of nonsignatory claims could not be overcome in Barbosa, it can be overcome here. Taken together, the First Circuit's decisions in Awuah and Apollo make clear that, under the circumstances of this case, the question of whether Shire can compel Meijer to arbitrate is for the arbitrator to decide.

4287358, at *5 (D. Del. July 27, 2020) (finding that no clear and unmistakable evidence that a

signatory and nonsignatory agreed to delegate arbitrability could possibly exist because they did

not sign an arbitration agreement with one another), with Robertson v. Enbridge (U.S.) Inc., No.

19-cv-01080, 2020 U.S. Dist. LEXIS 139381, at *10–13 (W.D. Pa. Aug. 4, 2020) (finding that

once a court determined that the contract delegated the adjudication of arbitrability to the

arbitrator, the defendant's status as a nonsignatory did not affect the calculus) (report and

recommendation).[7]  As one such court  recognized,

> [t]here is somewhat of a logical conundrum in finding that Ms. De Angelis must
> arbitrate the question of whether she agreed to arbitrate against nonsignatories.
> There is generally a presumption against delegation that may be overcome only
> with clear and unmistakable evidence; silence or ambiguity is not enough.  Even
> with a delegation clause, courts must determine whether a contract exists at all.  If
> the nonsignatories are not parties to the contract, then the Plaintiff has no agreement
> with them.
>
> But to adjudicate whether Ms. De Angelis is bound to arbitration with parties that
> she alleges are nonsignatories would be to engage in the type of analysis that the
> Supreme Court held impermissible in Henry Schein, Inc. v. Archer & White Sales,
> Inc.  There, the Court opined that once the parties have a delegation clause, a court
> possesses no power to decide the arbitrability issue, and that [j]ust as a court may
> not decide a merits question that the parties have delegated to an arbitrator, a court
> may not decide an arbitrability question that the parties have delegated to an
> arbitrator.  Whether a nonsignatory can enforce the arbitration agreement is a
> question of the enforceability of the arbitration clause, as to that defendant.  The
> parties agreed to delegate such questions to an arbitrator.

De Angelis v. Icon Ent. Grp. Inc., 364 F. Supp. 3d 787, 796–97 (S.D. Ohio 2019) (second

alteration in original) (internal citations and quotation marks omitted).

  This Court agrees with the reasoning in De Angelis and finds it to be consistent with both

Apollo and Henry Schein.  The Supreme Court's decision in Henry Schein fundamentally

---

[7] Before the report and recommendation could be adopted or rejected by the district court, the
parties requested that the court stay consideration of the motion to compel arbitration at issue.
See Notice of Partial Settlement, Robertson v. Enbridge (U.S.) Inc., No. 19-cv-01080 (W.D. Pa.
Sept. 22, 2020), ECF No. 226.

requires that when the question of arbitrability has been delegated to an arbitrator, courts must respect that delegation.  Henry Schein, 139 S. Ct. at 531.  Here, there has been such a delegation and thus the Court must defer to the arbitrator.

### C.    Shire Has Not Waived Its Right to Seek Arbitration

Meijer argues that Shire, by actively and continuously participating in this litigation, has waived its right to arbitrate and that it is for the Court to decide whether such a waiver has occurred.  [FWK 496-1 at 11–17].  Shire responds that it has not waived its right to arbitrate and that, waiver, like equitable estoppel, is an issue of arbitrability that has been delegated to the arbitrator.  [FWK 511-1 at 7–12].

With regard to the threshold question of who decides whether Shire has waived its right to arbitrate, Meijer points to Marie v. Allied Home Mortg. Corp., a case in which the First Circuit held that, even with a contractual provision that delegates questions of arbitrability, "waiver by conduct, at least where due to litigation-related activity, is presumptively an issue for the court."  402 F.3d 1, 14 (1st Cir. 2005).  Since 2005, courts in this circuit have applied Marie and evaluated waiver claims premised on litigation conduct rather than deferring to the arbitrator. See, e.g., Christensen v. Barclays Bank Del., No. 18-cv-12280, 2019 WL 1921710, at *5 (D. Mass. Apr. 30, 2019); Binienda v. Atwells Realty Corp., No. 15-cv-00253, 2018 WL 1271443, at *2 (D.R.I. Mar. 9, 2018); Cutler Assocs., Inc. v. Palace Constr., LLC, 132 F. Supp. 3d 191, 199–200 (D. Mass. 2015).  Shire argues that Marie is no longer good law after the Supreme Court's decision in Henry Schein.  [FWK 511-1 at 7 n.6].  In the Court's view, however, nothing in Henry Schein undermines Marie.  The Supreme Court's concern in that case was affording proper respect to the contractual delegation of arbitrability.  Here, whether Shire has forfeited its right to arbitrate claims against it by participating in this lawsuit is a different issue that does not

depend on the underlying arbitrability of the dispute.  Accordingly, as required by Marie,[8] the

Court will rule on the issue of waiver.

Whether Shire has waived its right to arbitrate through its participation in this litigation is

a matter of federal law.  See Barbosa, 2019 WL 3781629, at *7–8 (applying First Circuit law to

assess waiver claim); Binienda, 2018 WL 1271443, at *3–4 (same).[9]

> Although a party may waive a right to arbitrate—either explicitly or through its
> conduct—we resolve any doubts in favor of arbitration.  Such an approach is
> consistent with a liberal federal policy favoring arbitration.  A number of
> considerations guide our waiver inquiry.  These factors include: (1) whether the
> parties participated in a lawsuit or took other action inconsistent with arbitration;
> (2) whether the litigation machinery has been substantially invoked and the parties
> [are] well into preparation of a lawsuit by the time an intention to arbitrate [is]
> communicated; (3) whether there has been a long delay and trial is near at hand;
> (4) whether the party seeking to compel arbitration has invoked the jurisdiction of
> the court by filing a counterclaim; (5) whether discovery not available in arbitration
> has occurred; and, (6) whether the party asserting waiver has suffered prejudice.

FPE Found. v. Cohen, 801 F.3d 25, 29 (1st Cir. 2015) (alterations in original) (internal citations

and quotation marks omitted).  "In this Circuit, no one factor dominates the analytical framework

for determining whether a party has implicitly waived its right to arbitrate."  Lomas v. Travelers

Prop. Cas. Corp. (In re Citigroup, Inc. Cap. Accumulation Plan Litig.), 376 F.3d 23, 26 (1st Cir.

2004); see Tyco Int'l Ltd. v. Swartz, 422 F.3d 41, 46 (1st Cir. 2005) ("Once again, we emphasize

---

[8] The Court notes that although the First Circuit held in Marie that the issue of waiver is
"presumptively" for the court to decide, as far as the Court is aware, it has not provided guidance
regarding what facts or circumstances would be sufficient to rebut that presumption.  Further,
although the current version of the AAA's Commercial Rules states that "[n]o judicial
proceeding by a party relating to the subject matter of the arbitration shall be deemed a waiver of
the party's right to arbitrate," see American Arbitration Association, Commercial Arbitration
Rules and Mediation Procedures, Rule 52(a) (2013), which could be understood to mean that
waiver issues should be adjudicated by the arbitrator, the version of the AAA's Commercial
Rules in place at the time the First Circuit decided Marie had identical language.

[9] In any event, the parties agree that the analysis is essentially the same under Delaware law.
[FWK 496-1 at 13, 13 n.19; FWK 511-1 at 9 n.11].

that there is no bright-line rule for a waiver of arbitral rights, and each case is to be judged on its particular facts."). "To be sure, prejudice is essential for a waiver—but the required showing is 'tame at best.'" Joca-Roca Real Est., LLC v. Brennan, 772 F.3d 945, 949 (1st Cir. 2014) (quoting Rankin v. Allstate Ins. Co., 336 F.3d 8, 14 (1st Cir. 2003)). "The party advocating waiver has the burden of demonstrating prejudice." Id. at 948 (citing Sevinor v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 807 F.2d 16, 19 (1st Cir. 1986)).

Meijer argues that Shire waited too long to seek arbitration, actively participated in the litigation for years, took advantage of broad discovery rights unavailable in arbitration, and that Plaintiffs have been prejudiced, including by investing more time and resources than they would have had to in arbitration. [FWK 496-1 at 11–15]. Meijer further asserts that because Shire's claimed right to arbitration is premised on Actavis' arbitration agreements, Actavis' knowledge of the arbitration agreements should be imputed to Shire and that, in any event, Shire was independently responsible for investigating its own defenses against Meijer, even before Meijer formally intervened. [Id. at 15–17]. Finally, Meijer argues that forcing it to arbitrate its claims at this late stage would harm the DPP class as a whole. [Id. at 14–15]. In response, Shire maintains that it moved to compel arbitration on August 28, 2020, promptly after obtaining the RPA and GPPA on June 5, 2020 and July 29, 2020, respectively. [FWK 511-1 at 10, 10 n.19]; see also [FWK 512-3 ¶¶ 3–5]. Shire further avers that Actavis' knowledge is not imputed to it and that it had no duty to investigate, especially when the relevant documents were in the possession of an absent class member. [FWK 511-1 at 11–12]. With regard to prejudice, Shire asserts that the focus is properly on Meijer, rather than the DPP class as a whole, and that Meijer has suffered no prejudice. [Id. at 12].

With regard to the first waiver factor, Shire's participation in this lawsuit, Shire has undoubtedly participated, actively and consistently, for more than three years.  For present purposes, however, the relevant time period begins when Shire learned of Meijer's arbitration agreements with Actavis.  Upon learning of the agreements, Shire promptly filed its motion to compel arbitration.  Meijer argues that, either through imputation of Actavis' knowledge or because of an independent duty to investigate, Shire should have known about the arbitration agreements earlier.  The Court finds Meijer's arguments unpersuasive.

The case that Meijer cites to support its imputation argument is too factually dissimilar to be applicable.  In Restoration Preservation Masonry, Inc. v. Grove Europe Ltd., the First Circuit held that where a plaintiff could assert a waiver defense to a motion to compel arbitration against Company A, that plaintiff could assert the same defense against Company B, which had obtained, via assignment, Company A's assets and liabilities.  325 F.3d 54, 62–63 (1st Cir. 2003).  That is, because Company B had stepped into Company A's shoes vis-à-vis its relationship to the plaintiff, plaintiff retained any available defenses despite the assignment.  Id. Here, Shire has not stepped into Actavis' shoes and Meijer is not being deprived of an available defense because of an assignment.[10]  More generally, the Court declines to impute knowledge to Shire from an unaffiliated co-defendant, or limit the availability of certain defenses based on the actions of an unaffiliated co-defendant like Actavis.[11]  See Al Rushaid v. Nat'l Oilwell Varco,

---

[10] As noted above, Shire premises its equitable estoppel argument on the facts that Meijer's claims against Shire arise from the agreements containing arbitration provisions and that Meijer's claims against Shire and Actavis are substantially intertwined.  [FWK 477-1 at 23–27].

[11] Meijer cites Growtech Partners v. Accenture LLP for the proposition that a non-signatory seeking arbitration on estoppel grounds is subject to waiver by the signatory.  [FWK 526-1 at 12].  In that case, however, the signatory and nonsignatories were affiliated corporate entities.  Growtech Partners v. Accenture LLP, 118 F. Supp. 3d 920, 923 (S.D. Tex. 2015).  Finding that a non-signatory company has waived its right to compel arbitration based on its signatory

Inc., 757 F.3d 416, 422–23 (5th Cir. 2014) (noting that other courts have held that "the actions of an arbitration proponent's affiliates may be imputed to the proponent for the purposes of determining waiver when principles of agency or corporate law, such as the alter ego doctrine, would counsel such imputation" and holding same).

With regard to Meijer's argument that Shire had a duty to investigate its own defenses,[12] the Court agrees with Shire that it was not obligated to "scour materials in the possession of absent class members to preserve undisclosed arbitration rights."  [FWK 511-1 at 12].  Certainly, after the class was certified in September 2019, discovery as to an absent class member would have been generally inappropriate.  See Jubinville v. Hill's Pet Nutrition, Inc., No. 19-cv-00074, 2019 WL 1584679, at *10 (D.R.I. Apr. 12, 2019) ("The principle [that] discovery from absent members is generally not permitted [] applies after the class has been certified . . . .").  Although Shire could have sought discovery from Meijer prior to class certification and did not, the Court is not prepared to find that Shire waived its right to arbitrate by failing to do so, especially in

---

corporate affiliate's failure to assert that right is fundamentally different than finding that a non-signatory like Shire has waived its right to arbitrate based on the fact that Actavis, a completely independent company, has waived its rights.

[12] The case upon which Meijer primarily relies, Healy v. Cox Communications, Inc. (In re Cox Enters., Inc. Set-top Cable Television Box Antitrust Litig.), is readily distinguishable.  There, the defendant began inserting arbitration clauses into its agreements while the lawsuit was pending in an apparent effort to preclude putative class members from litigating their claims.  790 F.3d 1112, 1114–15 (10th Cir. 2015).  It was therefore beyond dispute that the defendant knew about the applicable arbitration agreements at all times.  Id. at 1119.  Moreover, that case involved a signatory's waiver of its arbitration right under an arbitration agreement that it required its customers to sign whereas this case involves an argument that a non-signatory waived its right to arbitrate by failing to timely assert its rights based on an agreement that it did not possess.  Meijer also cites In re Dealer Management Systems Antitrust Litigation in support of its duty to diligently investigate argument.  [FWK 526-1 at 13 n.32].  That case is also readily distinguishable.  There, the court found that the nonsignatory waived its right to arbitrate when it failed to assert the right notwithstanding that its signatory co-defendant had already done so.  362 F. Supp. 3d 510, 529–30 (N.D. Ill. 2019).  Here, had Actavis moved to compel arbitration while Shire sat idly by, the situation would be different.

light of the presumption against waiver.  See FPE Found., 801 F.3d at 29 ("Although a party may waive a right to arbitrate—either explicitly or through its conduct—we resolve any doubts in favor of arbitration.").  Here, the Court elected to allow limited discovery to permit Defendants to identify any defects in Meijer's adequacy as a class representative.  The Court will not now hold that Shire is barred from seeking redress based on that discovery because the discovery could have taken place earlier.

With regard to the second waiver factor, whether Shire has invoked the litigation machinery, the Court again notes that Shire was not aware of the arbitration agreements when it was invoking the litigation machinery.  Contra Joca-Roca, 772 F.3d at 949 (finding waiver where plaintiff "chose to eschew an available arbitral forum" by suing in federal court, was reminded by defendant "of the availability of arbitration" when the defendant raised the defense in its answer, but "turned a blind eye to this reminder," instead "wait[ing] more than eight months before seeking a stay in order to pursue arbitration"); In re Cox, 790 F.3d at 1118–19 (finding waiver where defendant knew of its arbitration right, nevertheless took part in extensive discovery related to class certification, and then moved to unwind the class by asserting its purported right to arbitrate 87% of the class's claims).  The waiver defense is meant to avoid gamesmanship by preventing a party from unduly delaying a motion to arbitrate to gain a strategic or tactical advantage during the course of litigation.  See Tyco, 422 F.3d at 46–47.  There is no evidence that Shire used the litigation machinery for an improper purpose or held off on its motion to compel arbitration to gain a strategic advantage.  Contra In re Cox, 790 F.3d 1118 ("Cox is essentially asking for a redo of the Rule 23 analysis based upon information it knowingly withheld from the district court . . . .").  Nor is there evidence that Shire sought arbitration because it was dissatisfied with how this litigation was proceeding.  Contra

Joca-Roca, 772 F.3d at 949 ("We are left to infer that the change in direction may well reflect the plaintiff's dissatisfaction with the way the court case was proceeding—and we do not condone the use of an arbitration clause as a parachute when judicial winds blow unfavorably.").

The third waiver factor concerns how close the case is to trial. Here, the Court has ruled on numerous Daubert motions and motions for summary judgment, and the case is approaching trial. Thus, the status of the case weighs in favor of finding waiver.

As for the fifth waiver factor,[13] whether discovery has progressed beyond where it would have for an arbitration, Meijer argues that Shire has obtained far more discovery in this litigation than it would have obtained through AAA arbitration, and notes that hundreds of thousands of pages of documents have been exchanged and that there have been dozens of depositions. [FWK 496-1 at 13–14; FWK 495 ¶¶ 15–16, 18–20]. Meijer also highlights the amount of discovery that the DPPs have obtained from Shire, Actavis, and non-parties. [FWK 495 ¶¶ 13–24]. The fact, however, is that even if Shire had moved to compel arbitration of Meijer's claims on the day the action was initiated, most, if not all, of that discovery would have taken place anyway. The more relevant issue is whether Shire has obtained more discovery from Meijer than it would have in arbitration. Meijer has produced 9,569 documents, responded to two sets of interrogatories, and sat for one deposition. [FWK 495 ¶ 15]. Pursuant to the RPA and GPPA,

███████████████████████████████████████████████████████████

██████████████████████████████ [FWK 476-1 at 6; FWK 476-4 at 14]. Because the record does not reflect how many requests for production led to the production of the 9,569 documents or how many interrogatories were included in the two sets, the Court cannot determine whether Shire has acquired outsized discovery compared to what it would have gotten in arbitration. In any

---

[13] As to the fourth waiver factor, Shire has filed no counterclaims.

event, the amount of discovery received from Meijer is not enough to strongly support a finding

of waiver.  Once again, the problem that the waiver defense is intended to address—a party

sitting on a right to arbitrate to obtain more extensive discovery in litigation—does not exist here

because Shire was not yet aware of its asserted right when it engaged in the discovery.  Contra

Joca-Roca, 772 F.3d at 948–49 ("Here, the plaintiff commenced a civil action, vigorously

prosecuted it, and then—after many months of active litigation—tried to switch horses

midstream to pursue an arbitral remedy.  To make matters worse, it made this abrupt about-face

in the absence of any material change in circumstances.").

Finally, as to the sixth waiver factor, prejudice to the party asserting waiver, Meijer

argues that because "plaintiffs invested countless more hours and costs in prosecuting this case

than they would have in arbitration," they would be prejudiced by an arbitration at this stage of

the proceedings.  [FWK 496-1 at 14]; see also [FWK 495 ¶¶ 5, 16, 33].  It also argues that

"Shire's attack on the sole proposed class representative will further delay or destroy the ability

to obtain full redress for Shire's misconduct for many class members, who would likely choose

not to bring individual claims."  [FWK 496-1 at 14–15].  Courts viewing prejudice in class

actions do so with an eye towards the entire litigation.  See In re Citigroup, 376 F.3d at 26.  Here,

there are two categories of potential prejudice: prejudice to Meijer from having to potentially

arbitrate its claims and prejudice to the rest of the class.

With regard to the first category, any prejudice is minimal given that Meijer has been

actively involved in the litigation only since June 2020.  As discussed above, if Meijer was

subjected to outsized discovery, that discovery was only marginally outsized.  Additionally, if

the arbitrator decides that Meijer's claims against Shire are arbitrable and if Meijer's claims

against Shire are, in fact, valid, the Court is confident that Meijer will obtain adequate relief in arbitration.

As to the second category, the prejudice to the other DPPs attributable to Shire's purported delay in invoking its arbitration right is also minimal.  Given that Shire asserted its right to arbitrate promptly after discovering it, there has not been much time for the DPPs to be prejudiced.  Notwithstanding Meijer's arguments, the vast majority of the time and resources that class counsel have expended in this case would have been expended regardless of whether Shire had sought to compel Meijer to arbitrate earlier than it did.  After all, Meijer was the third proposed class representative and was not actively involved in the litigation until June 2020.  Moreover, finding no waiver and requiring Meijer's claim to be arbitrated will not necessarily prevent the DPPs from obtaining redress, as Meijer argues it would.  See [FWK 496-1 at 14–15].  The arbitrator may find Meijer's claims not arbitrable and even assuming it finds them arbitrable, another adequate class representative can move to intervene and be appointed class representative.  Although the DPPs may have to expend additional resources in advancing another proposed class representative if Meijer's claims are deemed arbitrable, that potential prejudice is insufficient to support a finding of litigation-conduct waiver.

Thus, after considering the six waiver factors, and resolving any doubt in favor of arbitration, FPE Found., 801 F.3d at 29, the Court finds that Shire has not waived its right to seek arbitration of Meijer's claims against it.

### D.    Summary

For the reasons noted above, the Court finds that the arbitration agreements clearly and unmistakably evidence an intent to have the arbitrator decide arbitrability.  Whether Meijer's claims against Shire fall within the agreements' respective ambits and whether Shire, as a

nonsignatory, may compel arbitration based on equitable estoppel, are for the arbitrator to decide.[14]  The Court also finds that Shire has not waived its right to seek arbitration of Meijer's claims against it based on its litigation conduct.  The Court is sympathetic to Plaintiffs' position and takes no pleasure in potentially further delaying a case that has gone on for this long.  Ultimately, however, the Court is unwilling to usurp the role of the arbitrator and cannot find that Shire has waived a right when Shire only recently had reason to be aware of that right.  Accordingly, Shire's motion to compel arbitration is granted insofar as Meijer must now submit its claims to an arbitrator for a decision as to arbitrability.

## III.        MOTION TO BE APPOINTED CLASS REPRESENTATIVE

A plaintiff who has agreed to arbitrate her claim "cannot serve as a class representative in a litigated class action" because "[i]n order to maintain a class action, a plaintiff must have an individual claim; she cannot serve as a class representative without such a claim."  Karp v. CIGNA Healthcare, Inc., 882 F. Supp. 2d 199, 207 (D. Mass. 2012) (citing Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 156 (1982)); Doucette v. CarMax Auto Superstores Inc., No. 19-cv-10031, 2020 WL 1332836, at *5 (D. Mass. Mar. 23, 2020) ("As discussed above, [plaintiff] agreed to arbitrate his claims and he therefore cannot serve here as a class representative.").

Having concluded that the arbitrability of Meijer's claims must be decided by the arbitrator, the Court will deny Meijer's motion to be appointed class representative with leave to

---

[14] Meijer also argues that the GPPA contains ███████████████████████████████████████ Compliance with these sorts of ████████████████████████████████ is also for the arbitrator to decide.  See BG Grp. PLC v. Republic of Argentina, 572 U.S. 25, 34–35 (2014).

renew.  If the AAA determines that Meijer's claims against Shire are not arbitrable, Meijer may renew its motion and the Court will consider it then.

## IV.  CONCLUSION

Accordingly, Shire's motion to compel arbitration, [FWK 475-1], is <u>GRANTED</u> in part and Meijer's motion to be appointed class representative, [FWK 485], is <u>DENIED</u> with leave to renew.  Should Meijer wish to proceed, it must submit its claims to an arbitrator, as required by the RPA and GPPA, for a decision as to arbitrability.

**SO ORDERED.**

January 29, 2021                                             /s/ Allison D. Burroughs
                                                            ALLISON D. BURROUGHS
                                                            U.S. DISTRICT JUDGE