UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| In re INTUNIV ANTITRUST LITIGATION (Direct Purchasers) | Civil Action No. 1:16-cv-12653-ADB |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

This case arises from an alleged anticompetitive agreement made between the brand and generic manufacturers of an ADHD medication. Defendants Shire LLC and Shire U.S., Inc. (collectively, "Shire") manufacture Intuniv, the brand-name for extended release guanfacine hydrochloride. Actavis Elizabeth LLC, Actavis Holdco US, Inc., and Actavis LLC (collectively, "Actavis") manufacture Intuniv's generic counterpart. A class of Direct-Purchaser Plaintiffs (the "DPPs") allege that they paid inflated prices for Intuniv due to Shire and Actavis having improperly agreed to delay competition for both brand Intuniv and generic Intuniv in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2. See generally [ECF No. 140].

Presently before the Court are DPPs Rochester Drug Co-Operative, Inc. ("RDC") and BI-LO, LLC ("BI-LO")'s motion to be appointed class representatives ("Motion To Be Appointed Class Representatives"), [ECF No. 638], Shire's motion for leave to take limited discovery of absent class members ("Motion for Absent Class Member Discovery"), [ECF No. 645], and Shire's motion to compel arbitration and dismiss BI-LO's complaint in intervention, or stay pending arbitration ("Motion to Compel"), [ECF No. 665]. For the reasons set forth below, DPPs RDC and BI-LO's Motion to Be Appointed Class Representatives, [ECF No. 638], is

1

DENIED; Shire's Motion for Absent Class Member Discovery, [ECF No. 645], is <u>GRANTED</u>;

and Shire's Motion to Compel, [ECF No. 665], is <u>GRANTED</u> in part and <u>DENIED</u> in part.

## I.      BACKGROUND

### A.      Factual Background

#### 1.      Alleged Misconduct

For purposes of this order, the following facts, as summarized from the Court's previous

order on the DPPs' motion for class certification, [ECF No. 343], will suffice.

On September 2, 2009, the Food and Drug Administration ("FDA") approved a New

Drug Application for Shire's brand-name drug, Intuniv.  [ECF No. 343 at 2].  A few months

later, on December 29, 2009, Actavis filed an Abbreviated New Drug Application ("ANDA") for

its proposed generic version of Intuniv.  [<u>Id.</u>].  Several other companies subsequently sought

FDA approval to manufacture their own generic alternatives to Intuniv.  [<u>Id.</u> at 3].  As the first

generic manufacturer to file an ANDA, Actavis would have enjoyed "a 180-day period of

exclusivity during which no other generic" manufacturer could have manufactured an Intuniv

alternative.  <u>In re Loestrin 24 Fe Antitrust Litig.</u>, 814 F.3d 538, 543 (1st Cir. 2016) (citation and

internal quotation marks omitted).  During that exclusivity period, Shire and Actavis would have

been the only manufacturers approved by the FDA for Intuniv or a generic alternative.

Shire filed suit against Actavis pursuant to 21 U.S.C. § 335(j)(5)(B)(iii), which triggered

a 30-month stay of the FDA's approval of Actavis' ANDA for generic Intuniv.  [ECF No. 343 at

2–3]; <u>see</u> <u>FTC v. Actavis, Inc.</u>, 570 U.S. 136, 143 (2013) ("If the brand-name patentee brings an

infringement suit within 45 days, the FDA then must withhold approving the generic, usually for

a 30-month period, while the parties litigate patent validity (or infringement) in court" (citing 21

U.S.C. § 355(j)(5)(B)(iii))).  After a bench trial, the 30-month stay of the FDA's consideration of

Actavis' ANDA expired and the FDA approved generic Intuniv.  [ECF No. 343 at 3].

Before the trial court could issue its opinion, however, Shire and Actavis entered into a settlement agreement.  [ECF No. 343 at 3].  The DPPs argue that it appeared likely that the verdict was going to be in Actavis' favor and that the settlement was a reverse payment agreement, which guaranteed Actavis a 180-day exclusivity period in return for its delaying the launch of generic Intuniv until December 1, 2014.  [Id. at 3–4].

### 2. RDC's Bankruptcy Proceedings

While this action was ongoing, on March 12, 2020, RDC filed for bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Western District of New York.  See In re Rochester Drug Co-Operative, Inc. ("In re RDC"), No. 20-bk-20230, ECF No. 1 (Bankr. W.D.N.Y. Mar. 12, 2020).

The bankruptcy court confirmed RDC's proposed "Second Amended Chapter 11 Plan of Liquidation Dated January 15, 2021," ("Liquidating Plan") on February 26, 2021.  In re RDC, 2021 WL 771683, at *1 (Bankr. W.D.N.Y. Feb. 26, 2021).  The Liquidation Plan became effective on March 19, 2021.  See Notice of Effective Date of Chapter 11 Plan, In re RDC, ECF No. 1305 (Bankr. W.D.N.Y. Mar. 22, 2021).  Through the Liquidating Plan, and pursuant to the terms of the Liquidating Trust Agreement ("LTA"), RDC was liquidated into a new entity, called RDC Liquidating Trust.  Ex. 1 to the Liquidating Plan, LTA and Declaration of Trust, In re RDC, ECF No. 1145 at 49 (Bankr. W.D.N.Y. Jan. 15, 2021).  The Trust was established "for the sole purpose of collecting, holding, administering, liquidating and distributing the Liquidating Trust Assets for the benefit of the Beneficiaries . . . and with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Trust."  Id. at 49–50.

The Liquidating Plan also appointed Advisory Trust Group as the liquidating trustee ("Trustee").  In re RDC., 2021 WL 771683, at *3.

### B.      Relevant Procedural Background

FWK Holdings, LLC ("FWK") filed this action on December 30, 2016, [ECF No. 1], and RDC filed similar claims on January 11, 2017, Rochester Drug Co-Operative, Inc. v. Shire LLC, No. 17-cv-10050 (D. Mass. Jan. 11, 2017).  The Court granted a joint motion to consolidate the two actions on March 1, 2017.  [ECF No. 19].

**On September 24, 2019**: the Court granted the DPPs' motion to certify the following class:

> All persons or entities in the United States and its territories, or subsets thereof, that purchased Intuniv and/or generic Intuniv in any form directly from Shire or Actavis, including any predecessor or successor of Shire or Actavis, from October 19, 2012 through June 1, 2015 (the "Class").

[ECF No. 343 at 4, 23].  The Court, however, dismissed FWK as a class representative after finding that the relationship between FWK and class counsel was too entangled.  [Id. at 16].  With respect to RDC, the Court had reservations about its adequacy as a class representative because it had entered into a deferred prosecution agreement and settled civil claims with the United States in connection with failures to report suspicious opioid purchases, but ultimately agreed that it could serve as class representative.  [Id. at 17–18].

**On July 8, 2020**: the Court granted in part and denied in part Defendants' motion to decertify the class in light of RDC's bankruptcy.  [ECF No. 456].  The Court found that RDC could no longer adequately represent the interests of absent class members in light of conflicts of interest arising from its bankruptcy, but declined to decertify the class on that basis, and allowed motions to intervene.  [Id. at 14–15].

4

**On July 24, 2020**: the Court granted Meijer's, another member of the DPP class, [ECF No. 440 at 6], motion to intervene and allowed the parties to engage in limited discovery to "evaluate Meijer's adequacy as a class representative."  [ECF No. 462 at 20].

**On December 9, 2020**: the Court granted final approval of a settlement agreement that resolved all claims between Actavis and the DPP class.  See [ECF No. 551].

**On January 29, 2021**: the Court granted Shire's motion for an order compelling Meijer to arbitrate its claims against Shire, in part, holding that the arbitrability of Meijer's claims must be decided by an arbitrator.  [ECF No. 554].  In the same order, the Court denied Meijer's motion to serve as class representative, because "[a] plaintiff who has agreed to arbitrate her claim 'cannot serve as a class representative in a litigated class action[.]'"  [Id. at 25 (quoting Karp v. CIGNA Healthcare, Inc., 882 F. Supp. 2d 199, 207 (D. Mass. 2012)].  The Court stated that Meijer could renew its motion if the Arbitrator "determine[d] that Meijer's claims against Shire are not arbitrable[.]"  [Id. at 26].

**On March 16, 2021**: Meijer filed its arbitration demand, "request[ing] a ruling by the arbitrator that Shire cannot compel Meijer to arbitrate its antitrust claims under the doctrine of equitable estoppel."  [ECF No. 578-3 ¶ 2]; see also [ECF No. 578-2 at 6].

**On November 8, 2021**: as BI-LO alleges, direct purchaser Cardinal Health, Inc. and its subsidiaries and affiliates ("Cardinal Health") assigned its claims for its brand purchases to BI-LO.  See [ECF No. 571 at 9 (citing ECF No. 571-1 ¶ 1)].

**On June 8, 2022**: the Arbitrator issued her decision, finding that "Meijer's claims against Shire fall within the scope of the RPA and GPPA arbitration provisions, and that Shire as a non-signatory, may enforce those provisions."  [ECF No. 578-2 at 15].  The Arbitrator also found

"the contractual conditions precedent to arbitration do not preclude Shire from arbitrating on these facts." [Id.].

**On March 15, 2023:** the Court denied Meijer's motions to reconsider the Court's January 29, 2021 order and to vacate the arbitration award, and granted Shire's cross-motion to confirm the arbitration award. [ECF No. 613 at 33]. The Court also granted BI-LO's motion to intervene, and Shire's motion for limited discovery into BI-LO's adequacy. [Id.].

**On July 11, 2023**, DPPs RDC and BI-LO filed their Motion To Be Appointed Class Representatives. [ECF No. 638]. **On July 28, 2023**, Shire filed its Motion for Absent Class Member Discovery. [ECF No. 645]. **On August 31, 2023**, Shire filed its Motion to Compel BI-LO to arbitrate its claims. [ECF No. 665]. Shire has opposed RDC and BI-LO's Motion To Be Appointed Class Representatives, and the DPPs have opposed Shire's Motion for Absent Class Member Discovery and Motion to Compel. [ECF Nos. 651, 668, 675]. All Motions are now ripe for the Court's review.

## I.     MOTION TO BE APPOINTED CLASS REPRESENTATIVE

### A.     RDC

RDC moves to be appointed class representative, arguing that its claims are typical of the class's claims and that RDC could adequately represent the class. Shire disputes both typicality and adequacy, asserting that RDC is atypical because of its credibility issues, and that there have been no material changes that warrant the Court re-considering its previous ruling that RDC was not an adequate class representative.

The parties also disagree on the standard that should guide the Court's review, given that the Court previously ruled that RDC was not an adequate class representative. Shire argues that the instant motion is tantamount to a motion for reconsideration, and that "'motions for reconsideration are appropriate only' where 'the moving party presents newly discovered

6

evidence, if there has been an intervening change in the law, or if the movant can demonstrate that the original decision was based on a manifest error of law or was clearly unjust.'" [ECF No. 668-1 at 7 n.3 (quoting U.S. v. Allen, 573 F.3d 42, 53 (1st Cir. 2009))]. Shire further urges that reconsideration is "extraordinary" and "typically denied," and that to the extent that there is "newly discovered evidence" it only provides further support for the Court's prior ruling. [Id. at 9–10, 9 n.12 (quoting Ferrer Marrero v. Misey Rest., Inc., No. 17-cv-01911, 2020 WL 13646258 (D.P.R. Jan. 30, 2020))]. The DPPs respond that "Rule 23 permits courts to 'amend certification orders to reflect major changes or minor adjustments to the class;' [and] in doing so, courts 'consider "the criteria of Rule 23(a) and (b) in light of factual and legal developments" and if "the parties or the class would be unfairly prejudiced by a change in proceedings."'" [ECF No. 672-3 at 5 (first quoting In re Pharm. Indus. Average Wholesale Price Litig., 588 F.3d 24, 39 (1st Cir. 2009); and then quoting Reid v. Donelan, No. 13-cv-30125, 2018 WL 5269992, at *3 (D. Mass. Oct. 23, 2018))]. The Court finds, under either standard, that RDC is not an adequate class representative.

"Typicality requires that the class representative's 'injuries arise from the same events or course of conduct as do the injuries of the class,' but his claims need not be 'identical to those of absent class members.'" Ouadani v. Dynamex Ops. E., LLC, 405 F. Supp. 3d 149, 162 (D. Mass. 2019) (quoting Henderson v. Bank of N.Y. Mellon, N.A., 332 F. Supp. 3d 419, 427 (D. Mass. 2018)). Conversely, "[t]ypicality may be defeated where the class representatives are subject to unique defenses which threaten to become the focus of the litigation." Garcia v. E.J. Amusements of N.H., Inc., 98 F. Supp. 3d 277, 288 (D. Mass. 2015) (citation and internal quotation marks omitted).

"The adequacy requirement demands that the proposed class representatives show that they 'fairly and adequately protect the interests of the class.'"  [ECF No. 343 at 13 (quoting Fed. R. Civ. P. 23(a)(4))].  "The moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation."  Id. (quoting Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985)).

> "[A] class representative *always* has a conflict of interest of sorts, because he has an individual as well as a representative interest in the outcome of the case."  Dechert v. Cadle Co., 333 F.3d 801, 802–03 (7th Cir. 2003).  Further, "there is a danger remarked in numerous cases that the lawyer will negotiate a settlement with the defendant that gives the lawyer a large fee but the class a meager recovery."  Id. at 802–03.  "[P]erfect symmetry of interest is not required and not every discrepancy among the interests of class members renders a putative class action untenable.  'Only conflicts that are fundamental to the suit and that go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement.'"  Matamoros v. Starbucks Corp., 699 F.3d 129, 138 (1st Cir. 2012) (quoting 1 William B. Rubenstein, Newberg on Class Actions § 3:58 (5th ed. 2012)).  A conflict must be more than "merely speculative or hypothetical" to disqualify a class representative.  In re Solodyn (Minocycline Hydrochloride) Antitrust Litig., No. 14-cv-02503, 2017 WL 4621777, at *13 (D. Mass. Oct. 16, 2017) (quoting In re Nexium Antitrust Litig., 777 F.3d 9, 21 (1st Cir. 2015)).

[ECF No. 456 at 6].

### 1.   Credibility

As noted above, Shire argues that RDC does not satisfy Rule 23(a)'s typicality requirement, because its "criminal reputation renders it atypical of the DPP class."  [ECF No. 668-1 at 18].

In its previous order certifying the class, the Court rejected Shire's argument that RDC's alleged criminal conduct—including that it had "recently entered into a deferred prosecution agreement and settled civil claims brought by the United States in connection with failures to

report suspicious opioid purchases," and that "[t]wo of its former executives, including its former CEO, were . . . criminally charged, attracting considerable media attention"— disqualified RDC from serving as a class representative. [ECF No. 343 at 17]. In evaluating this argument, the Court recognized that "[c]redibility and honest dealing, particularly in litigation, may inform a proposed class representative's adequacy," [id.], but also that "adequacy should 'be assessed in light of the class representative's conduct in this or previous litigation, not based on a subjective evaluation of their personal qualifications as allegedly and tenuously evidenced by their prior criminal record." [Id. at 17–18 (quoting Dvornikov v. Landry's Inc., No. 15-cv-13286, 2017 WL 1217110, at *10 (D. Mass. Mar. 31, 2017))]. That said, the Court also noted that in denying "RDC's request for a protective order prohibiting Defendants from probing the allegations of criminal behavior by RDC," it had previously found that "some discovery was appropriate 'where the allegedly unlawful conduct [was] close in time to the events at issue and could lead reasonable minds to question whether a potential institutional class representative has a culture of dishonesty or disrespect for the law.'" [Id. at 18 (quoting ECF No. 210 at 4)]. At that stage, the Court held that it was a "close call," but that RDC's potential credibility issues did not alone disqualify it from serving as class representative. [Id.].

Shire now argues that "additional facts have come to light that further undermine RDC's credibility." [ECF No. 668-1 at 18]. Specifically, since the Court's previous rulings, "Laurence Doud III—RDC's CEO from 1991-2017 (including the entirety of the 2012-2015 class damages period)—was tried and convicted in early 2023 for his part in RDC's criminal enterprise." [Id. at 18–19]. Shire urges that at Mr. Doud's trial, "evidence was presented that 'employees in RDC's compliance department intentionally shipped drugs to those pharmacies, and others, knowing they were being diverted,'" and that "RDC knew 'about bad doctors, the company kn[ew] about

cash . . . [a]nd they [kept] shipping pills, [kept] shipping deadly fentanyl.'" [Id. at 19 (quoting ECF No. 179 at 1930:21–24)]. Thus, according to Shire, "[i]f there was any doubt that RDC's conduct demonstrated a 'culture of dishonesty' and 'disrespect for the law,' it evaporated with Mr. Doud's trial and conviction." [Id.]. Additionally, Shire asserts that the fact of Mr. Doud's conviction, which was based on proof of a "dishonest act or false statement," as well as the guilty plea of another executive, William Pietruszewski, will be automatically admissible at trial. [Id. at 19–20].

The Court finds that RDC's criminal conduct, including these new facts raised by Shire, does not alone demonstrate that RDC is atypical. Even assuming that Doud's conviction and Pietruszewski's guilty plea are admissible at trial and that Shire may use them to impeach RDC's credibility, it seems unlikely that this issue will "become the focus of the litigation," Garcia, 98 F. Supp. 3d at 288, and the Court thus declines to hold that RDC is atypical for this reason. Likewise, these new facts do not warrant reconsideration of the Court's previous holding that RDC was not inadequate for this reason alone.

   2. <u>Bankruptcy</u>

In moving to be appointed, RDC urges that there have been both legal and factual changes that warrant re-evaluation of the Court's determination that RDC, then going through Chapter 11 bankruptcy proceedings, was not an adequate class representative. [ECF No. 639-5 at 16–22]. Shire disagrees. [ECF No. 668-1 at 9–17].

The Court previously found that the First Circuit had not yet addressed the issue of whether a Chapter 11 debtor-in-possession could serve as a class representative. [ECF No. 456 at 6]. In its analysis, the Court therefore looked to out-of-circuit cases, including <u>Dechert v. Cadle Co.</u>, 333 F.3d 801 (7th Cir. 2003) and <u>In re Merrill Lynch & Co., Inc. Research Reports</u>

Securities Litigation, 375 B.R. 719, 726 (S.D.N.Y. 2007), in which the Seventh Circuit and

Southern District of New York, respectively, found that a Chapter 7 trustee could not adequately

serve as a class representative, because the trustee's role as fiduciary for the bankruptcy creditors

created actual conflicts of interest with other class members.  In Dechert, the Seventh Circuit

explained:

> It might seem that the conflict of interest in this case between the trustee in
> bankruptcy and the members of the class (other than the estate in bankruptcy) is
> inherent in class actions because a named plaintiff cannot be assumed to have the
> same interest in the litigation as the unnamed class members.  So what difference
> does it make whether the named plaintiff is a trustee in bankruptcy?  The difference
> is that in the usual class action the named plaintiff is a nominal party and the real
> party is the lawyer for the class.  The lawyer has no reason to favor the named
> plaintiff over the rest of the class members.  When the named plaintiff is a fiduciary,
> however, he cannot just "go along" with the class lawyer.  He has a duty to seek to
> maximize the value of his claim, and this duty may collide with his fiduciary duty
> as class representative (if he is permitted to be the class representative) to represent
> all members of the class equally.  Such a collision is especially likely in a case in
> which the fiduciary is a trustee in [Chapter 7] bankruptcy, because class-action
> litigation tends to be protracted yet the Bankruptcy Code requires the trustee to
> complete his work expeditiously.

333 F.3d at 803 (citing 11 U.S.C. § 704(1)).  The Seventh Circuit further noted that the case

"feature[d] another conflict of interest besides that inherent in the trustee's dual role as class

representative and creditors' representative," that is, that "[t]he defendant . . . [wa]s affiliated

with . . . [a] firm [that was] . . . one of [the proposed class representative's] creditors, and by

virtue of the affiliation with [that firm] . . . [defendant] [wa]s an indirect creditor of [the proposed

class representative]."  Id. at 803–04.  In Merrill Lynch, the Southern District found the same

inherent conflicts of interest.  375 B.R. at 727–28.

Although the Dechert and Merrill Lynch courts declined to qualify Chapter 7 trustees as

class representatives, both also declined to "lay down a flat rule that a trustee in bankruptcy (or,

what is the equivalent, a debtor in possession) can never be a class representative."  Dechert, 333

F.3d at 803; Merrill Lynch, 375 B.R. at 727 (quoting Dechert, 333 F.3d at 803).  In each case,

the trustee would have been the only class representative, <u>Dechert</u>, 333 F.3d at 804; <u>Merrill Lynch</u>, 375 B.R. at 724, but the <u>Dechert</u> court explained that "[t]here would be no actual conflict if one of the other class members were the named plaintiff, for the trustee would then have no control over the litigation," 333 F.3d at 804. Likewise, the <u>Dechert</u> court contemplated the possibility of trustees serving as class representatives where "the expected recovery of individual class members is substantial and only a fiduciary is available to be the class representative," but noted "[t]here ha[d] been no showing of either circumstance." <u>Id.</u> at 803. In <u>Merrill Lynch</u>, the Southern District of New York recognized the possibility of the same exceptional cases but found that "[a]lthough Plaintiff assert[ed] that [the proposed representative's] expected recovery [was] 'millions of dollars,' and therefore substantial, there ha[d] been no showing that the Trustee [was] the only available class representative." 375 B.R. at 728.

In view of this caselaw, the Court previously found that because RDC was then going through bankruptcy, and thus "ha[d] at least two conflicting duties" to creditors and absent class members; Defendants, both Shire and Actavis (through Teva and Takeda), were creditors in that bankruptcy, making RDC's conflict of interest "all the more pertinent"; and because it would be the only class representative, RDC would not be an appropriate class representative. [ECF No. 456 at 6–11]. On this final point, the Court noted that "[e]ven those courts that have rejected <u>Dechert</u>'s reasoning have found that a bankruptcy trustee may be an appropriate class representative so long as it is not the only class representative." [<u>Id.</u> at 10 (citation omitted)]. Nevertheless, the Court explained that it was also not endorsing "a blanket rule that a debtor-in-possession could never be an adequate class representative," and that "there may be cases in which the representative plaintiff's debt to a defendant would be insignificant enough that it

would not undermine the plaintiff's adequacy, particularly if the representative plaintiff was sharing the role with another plaintiff." [Id. at 11–12, 15].

Since the Court's ruling, as the DPPs point out, [ECF No. 639-5 at 17–19], several out-of-circuit courts have found RDC to be an adequate class representative. See In re Zetia (Ezetimibe) Antitrust Litig. ("In re Zetia"), No. 18-md-02836, 2020 WL 3446895 (E.D. Va. June 18, 2020), R. & R. adopted, 481 F. Supp. 3d 571 (E.D. Va. 2020), vacated and remanded on other grounds, 7 F.4th 227 (4th Cir. 2021); In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig. ("In re Suboxone"), No. 13-md-02445, 2021 WL 214302, at *4–5 (E.D. Pa. Jan. 21, 2021); In re Suboxone, No. 13-md-02445, 2022 WL 309178, at *1 (E.D. Pa. Feb. 2, 2022).

Additionally, the DPPs assert that there have been several factual changes relevant to RDC's adequacy:

- On March 29, 2021, RDC was liquidated into a new entity, called RDC Liquidating Trust, and Advisory Trust Group was appointed as the trustee ("Trustee"). [ECF No. 639-5 at 11]; Ex. 1 to the Liquidating Plan, LTA and Declaration of Trust, In re RDC, ECF No. 1145 at 49 (Bankr. W.D.N.Y. Jan. 15, 2021); In re RDC, 2021 WL 771683, at *3.

- The DPPs settled their claims with Actavis, so the value of RDC's debt owed to Defendants has decreased. [ECF No. 639-5 at 11]. Previously, the Court noted that "RDC owe[d] Defendant Shire $185,666.78," and Defendant "Actavis' affiliates Takeda and Teva $857,496.49 and $942,931.47, respectively." [ECF No. 456 at 7].

Currently, RDC asserts it owes Shire $178,470.93. [ECF No. 639-5 at 11].[1]

---

[1] The parties dispute what percentage of asserted general unsecured claims Shire's claim for roughly $180,000 comprises. The DPPs assert that Shire's claim is one of approximately 3,700 claims, comprising "0.00008% of the total of more than $226 billion in asserted general unsecured claims." [ECF No. 639-5 at 11]. Shire responds that there is "no basis" or "concrete evidence" for this $226 billion figure; that in January 2021, "RDC represented that its total liabilities were $96 million"; and that the "Liquidating Plan . . . [has] characterized unsecured claims as 'overstated.'" [ECF No. 668-1 at 11].

The DPPs also argue that RDC's stake in the litigation is substantial (approximately $8.6 million) and that RDC may be the only available class representative. [ECF No. 639-5 at 9]. They also point out that "[f]our different class members have stepped up to serve as class representatives and participated in discovery, including two that secured assignments to stand in." [Id. at 20]. Further, they aver that "RDC may be unique in its ability and willingness to serve," where "formidable business realities stand in the way of class representatives stepping forward, as many are loath to sue their suppliers for fear of lost business or retaliation." [Id. at 20–21].

The Court finds that these intervening changes have not restored RDC's adequacy as a class representative. Although the Liquidating Plan has been confirmed, and RDC has been liquidated into the RDC Liquidating Trust, the Trustee has all the same "duties and responsibilities" that RDC possessed as debtor-in-possession. [ECF No. 456 at 8–10]; see also In re Martin, 817 F.2d 175, 177 n.1 (1st Cir. 1987) ("§ 1107(a) 'places the [Chapter 11] debtor in possession in the shoes of a trustee in every way.'" (quoting Matter of Triangle Chems., Inc., 697 F.2d 1280, 1284 (5th Cir. 1983))). As such, the Trustee now has the same conflicts of interest that the Court previously determined that RDC possessed.[2] Further, although the value of

---

[2] Several of the cases that subsequently qualified RDC as a class representative distinguished Dechert based on the fact that RDC was or had been proceeding through Chapter 11 rather than Chapter 7 bankruptcy, and thus did not possess the "additional conflict, highlighted in Dechert, between the trustee's 'obligation to liquidate the property of the Estate expeditiously' and 'the class's interest in continuing to prosecute what [was] already a protracted lawsuit.'" In re Zetia, 2020 WL 3446895, at *25 (quoting Merrill Lynch, 375 B.R. at 727); see In re Suboxone, 2021 WL 214302, at *4.

Chapter 11 bankruptcies typically involve reorganization rather than liquidation. Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc., 554 U.S. 33, 37 n.2 (2008) ("[Although] Chapter 11 expressly contemplates liquidations," "the central purpose of Chapter 11 is to facilitate reorganizations rather than liquidations (covered generally by Chapter 7)[.]"); id. ("Chapter 11

14

RDC's debt owed to defendants has been reduced since Actavis settled, the Trustee would still have a conflicting duty to Shire.  Likewise, RDC's expected recovery is substantial and several other class members have been unsuccessful in seeking appointment as class representatives. That said, although, as the DPPs assert, others may be "loath to sue their suppliers for fear of lost business or retaliation," [ECF No. 639-5 at 21], and may not wish to serve, the DPPs have not shown that RDC is in fact the only available class representative.

Finally, unlike the subsequent cases that have qualified RDC, see, e.g., In re Suboxone, 2021 WL 214302, at *4–5, here, RDC would be the sole class representative because, as further discussed below, the Court finds that BI-LO must submit its claims to arbitration.[3]  Although, as the DPPs point out, RDC's counsel are not the only class counsel, RDC, as sole class representative, would maintain substantial control over the class.

For all these reasons, the Court finds that RDC would not be an adequate class

_____

bankruptcy proceedings ordinarily culminate in the confirmation of a reorganization plan."). Thus, Chapter 11 trustees do not owe a statutory duty to liquidate the estate expeditiously.  See 11 U.S.C.A. § 1106.  That said, as Shire points out, following the confirmation of the Liquidation Plan, "[t]he Liquidating Trustee's duty to expeditiously liquidate assets exists irrespective of whether the bankruptcy is filed under Chapter 7 or 11 of the Code due to the express terms of the Liquidating Plan that impose this obligation on RDC (and by extension the Liquidating Trustee)."  [ECF No. 683 at 6 & n.15 (quoting Liquidating Plan § 5.5 ("noting RDC will continue to exist solely for the purpose of 'winding up its affairs **as expeditiously as reasonably possible**' and 'liquidating . . . all unliquidated [a]ssets, **as expeditiously as reasonably possible**[,]' including 'enforcing and prosecting claims, interests . . . and the prosecution of . . . Causes of Action'"); then quoting Liquidating Plan § 5.2 ("noting 'This Plan will be implemented by the Liquidating Trustee . . . All actions taken under this Plan in the name of the Debtor, as applicable, **shall be taken through the Liquidating Trustee**.'") (emphasis added); and then quoting LTA at Recital G ("noting 'The Trust is established for the purpose of . . . liquidating the Liquidating Trust Assets . . . **including to prosecute any and all Causes of Action**'") (emphasis added))].

[3] The DPPs also indicate that if the Court were to qualify RDC as class representative, they would withdraw their motion to appoint BI-LO as class representative.  See [ECF No. 639-5 at 8].

representative, in the absence of other class representatives, and denies RDC's motion to be appointed class representative.

### B. BI-LO

As further discussed below, the Court finds that BI-LO must submit its claims to arbitration. A plaintiff who has agreed to arbitrate her claim "cannot serve as a class representative in a litigated class action" because "[i]n order to maintain a class action, a plaintiff must have an individual claim; she cannot serve as a class representative without such a claim." Karp, 882 F. Supp. at 207 (citing Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 156 (1982)); Doucette v. CarMax Auto Superstores Inc., No. 19-cv-10031, 2020 WL 1332836, at *5 (D. Mass. Mar. 23, 2020) ("As discussed above, [plaintiff] agreed to arbitrate his claims and he therefore cannot serve here as a class representative."). Having concluded that the arbitrability of BI-LO's claims must be decided by the arbitrator, the Court denies BI-LO's motion to be appointed class representative with leave to renew. If the arbitrator determines that BI-LO's claims against Shire are not arbitrable, BI-LO may renew its motion and the Court will consider it then.

## II. MOTION TO COMPEL ARBITRATION

Shire "move[s] (i) to compel [BI-LO] to arbitrate its claims, and (ii) to dismiss BI-LO's Complaint in Intervention, or in the alternative, to stay BI-LO's action pending arbitration." [ECF No. 667-1 at 8]. Shire argues that BI-LO's corporate affiliates, Winn-Dixie Logistics, Inc. and its successor, Winn-Dixie Logistics, LLC ("Winn-Dixie"), entered into agreements that require BI-LO to arbitrate its claims against Actavis and, because of the doctrine of equitable estoppel, BI-LO must therefore also arbitrate its related claims against Shire. [Id. at 8–9]. Further, as it did with Meijer, [ECF No. 477-1 at 27], Shire argues that because the arbitration agreements at issue delegate the threshold question of arbitrability to the arbitrator, the Court

must dismiss BI-LO's complaint, or stay the litigation, until an arbitrator decides whether BI-LO must arbitrate.  [ECF No. 667-1 at 17].

In opposition, the DPPs argue that "Cardinal's assigned claims that BI-LO asserts are against Shire, not Actavis, and they arise from purchases under the relevant purchase agreements with Shire, not the Actavis Agreements," [ECF No. 675-1 at 5], and that Shire's equitable estoppel argument, an issue to be decided by the Court, fails for a number of reasons. See [id. at 5–6].

### A.     The Arbitration Agreements

Shire identifies two agreements that it believes require BI-LO to arbitrate its claims against Shire.  [ECF No. 667-1 at 12–14].

First, in November 2009, Winn-Dixie Logistics, Inc. (BI-LO's corporate affiliate) entered into a Retail Purchase Agreement ("RPA") with Watson Pharma, Inc. ("Watson"), pursuant to which Watson agreed to sell certain pharmaceutical products to Winn-Dixie.  [ECF No. 669-9]. Shire states, and the DPPs do not dispute, that BI-LO and Winn-Dixie Logistics, Inc.'s parent corporation merged in 2012, and that as of at least December 2014, "BI-LO, Winn-Dixie Logistics, Inc. (and its successor, Winn-Dixie Logistics, LLC) have been operated under the common control of parent Southeastern Grocers, Inc. or its predecessor entity(ies)."  [ECF No. 667-1 at 8 n.2 (citations omitted)].  Likewise, Watson merged with Actavis in October 2012, with Actavis as the surviving company.  See [id. at 8 (citing Actavis plc, Annual Report (Form 10-K) (Feb. 25, 2014))].[4] ████████████████████████████████████████ ████████████████████████████████████████████████████  See [ECF No.

---

[4] The DPPs do not dispute this point.

669-2 at 207:6–21, 214:2–215:21; ECF No. 669-11].



[ECF No. 669-10 § 14.2].

Additionally, in March 2017, Winn-Dixie Logistics, LLC (Winn-Dixie Logistics, Inc.'s successor and thus also BI-LO's corporate affiliate)[5] entered into a Generic Products Purchase Agreement ("GPPA") with Teva Pharmaceuticals USA, Inc. ("Teva"). [ECF No. 669-13]. Both Actavis and Teva are wholly-owned indirect subsidiaries of Teva Pharmaceutical Industries Limited. See [ECF Nos. 55, 256].

[ECF No. 667-1 at 13 (citing ECF No. 669-2 at 230:22–231:21, 239:14–248:12; ECF Nos. 669-15–669-18)].

---

[5] As noted above, BI-LO, Winn-Dixie Logistics, Inc. (and its successor, Winn-Dixie Logistics, LLC) have been operated under the common control of parent Southeastern Grocers, Inc. or its predecessor entity(ies)." [ECF No. 667-1 at 8 (citations omitted)].



████████████████████████████████████
████████████████████████████████████

[ECF No. 669-13 §§ 14.3–14.4].

### B.    Discussion

There is a presumption that "courts (not arbitrators) must 'resolve gateway disputes about

whether a particular arbitration clause binds parties in a particular case.'" McKenzie v. Brannan,

19 F.4th 8, 17 (1st Cir. 2021) (quoting Barbosa v. Midland Credit Mgmt., Inc, 981 F.3d 82, 93

n.13 (1st Cir. 2020)).  That said, the Supreme Court has explained that

> [w]hen the parties' contract delegates the arbitrability question to an arbitrator, a
> court may not override the contract.  In those circumstances, a court possesses no
> power to decide the arbitrability issue.  That is true even if the court thinks that the
> argument that the arbitration agreement applies to a particular dispute is wholly
> groundless.

Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 529 (2019).  The Supreme

Court has also cautioned, however, that "[c]ourts should not assume that the parties agreed to

arbitrate arbitrability unless there is clea[r] and unmistakabl[e] evidence that they did so."  First

Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995) (second and third alterations in

original) (internal quotation marks omitted) (quoting AT&T Techs., Inc. v. Commc'ns Workers

of Am., 475 U.S. 643, 649 (1986)).  ████████████████████████████

████████████████████████  See [ECF No. 669-10 § 14.2 ████

████████████████████████████████████████████

████████████████████████████████████████

████████████████  ECF No. 669-13 §§ 14.3–14.4 ████████

████████████████████████████████████████████

██████████████████████████████.  Rule 7(a) of the AAA arbitration rules, in

turn, states that the "arbitrator shall have the power to rule on his or her own jurisdiction,

20

including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim, without any need to refer such matters first to a court." Am. Arb. Ass'n, Com. Rules and Mediation Procs., Rule 7(a) (2022). As the Court has previously held, see [ECF No. 554 at 10–11, 15–16], "incorporation of the AAA arbitration rules constitutes clear and unmistakable evidence of the parties' intent to delegate arbitrability issues to the arbitrator," Bossé v. N.Y. Life Ins. Co., 992 F.3d 20, 29 (1st Cir. 2021) (citing Awuah v. Coverall N. Am., Inc., 554 F.3d 7, 11 (1st Cir. 2009)); see also Awuah v, 554 F.3d at 11 ("Rule 7(a) says plainly that the arbitrator may 'rule on his or her own jurisdiction' including any objection to the 'existence, scope or validity of the arbitration agreement.' This is about as 'clear and unmistakable' as language can get, meeting the standard we have followed." (citations omitted)).[6] Thus, the Court finds that the 2009 RPA and the 2017 GPPA delegate issues of arbitrability to the arbitrator.

Likewise, "unless [a party] challenge[s] the delegation provision specifically, we must treat it as valid under § 2 [of the Federal Arbitration Act ("FAA")], and must enforce it under §§ 3 and 4, leaving any challenge to the validity of the [arbitration agreement] as a whole for the arbitrator." Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 72 (2010); id. at 70 (a delegation provision is an "additional agreement [which] is valid under § 2 'save upon such grounds as exist

---

[6] See also Mendoza v. Fred Haas Motors, Ltd., 825 F. App'x 200, 202 (5th Cir. 2020) ("Incorporating the [AAA Commercial] rules into the agreement 'presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.'" (quoting Petrofac, Inc. v. DynMcDermott Petrol. Ops. Co., 687 F.3d 671, 675 (5th Cir. 2012))); Blanton v. Domino's Pizza Franchising LLC, 962 F.3d 842, 846 (6th Cir. 2020); Richardson v. Coverall N. Am., Inc., 811 F. App'x 100, 103 (3d Cir. 2020); Dish Network L.L.C. v. Ray, 900 F.3d 1240, 1246 (10th Cir. 2018); Brennan v. Opus Bank, 796 F.3d 1125, 1130 (9th Cir. 2015); Fallo v. High-Tech Inst., 559 F.3d 874, 878 (8th Cir. 2009); Contec Corp. v. Remote Sol., Co., 398 F.3d 205, 208 (2d Cir. 2005); Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship, 432 F.3d 1327, 1332 (11th Cir. 2005).

at law or in equity for the revocation of any contract.'").  The DPPs argue that the "settlement

between Actavis and the direct purchaser class [the Actavis Settlement] . . . supersedes and

extinguishes the [Arbitration Agreements] with respect to the claims of the direct purchaser

class," [ECF No. 675-1 at 8], which would seem to go to the continuing enforceability of the

Arbitration Agreements (an issue for the arbitrator), but do not specifically challenge the validity

of the delegation provision.  Thus, the Court finds that the delegation provision is valid and an

arbitrator must decide any arbitrability issues.

As the Court previously held, the fact that Shire, a non-signatory, is the one seeking to

invoke the Arbitration Agreements, does not change this result.  See [ECF No. 554 at 11–16].

Although the DPPs have made clear that they disagree with the legal reasoning of the Court's

previous ruling, [ECF No. 675-1 at 10–12], they have not raised any arguments specific to BI-

LO or these Arbitration Agreements that counsel a different result.  ███████████████

████████████████████████████████████████████, it is for an

arbitrator, rather than the Court, to decide whether non-signatory Shire can compel BI-LO to

arbitrate its claims.

Accordingly, Shire's motion to compel arbitration is <u>GRANTED</u> insofar as BI-LO must

now submit its claims to an arbitrator for a decision as to arbitrability.

Shire further requests that if the Court grants its motion to compel arbitration, the Court

also dismiss BI-LO's complaint in intervention.  [ECF No. 665].

> Section 3 of the FAA requires that where issues brought before a court are
> arbitrable, the court shall "stay the trial of the action until such arbitration has been
> had in accordance with the terms of the [arbitration] agreement."  However, a court
> may dismiss, rather than stay, a case when all of the issues before the court are
> arbitrable.

Bercovitch v. Baldwin Sch., Inc., 133 F.3d 141, 156 n.21 (1st Cir. 1998) (citations omitted); see also Dialysis Access Ctr., LLC v. RMS Lifeline, Inc., 638 F.3d 367, 372 (1st Cir. 2011) ("Where one side is entitled to arbitration of a claim brought in court, in this circuit a district court can, in its discretion, choose to dismiss the law suit, if all claims asserted in the case are found arbitrable." (internal quotation omitted)). Because the Court has found only that the threshold issue of arbitrability is arbitrable, the Court declines to exercise its discretion to dismiss BI-LO's complaint, and Shire's motion to dismiss is therefore DENIED. Instead, BI-LO's action is STAYED pending a decision by an arbitrator as to the arbitrability of BI-LO's claims.

### III.   MOTION FOR LEAVE TO TAKE DISCOVERY OF ABSENT CLASS MEMBERS

Shire requests an order "granting Shire forty-five (45) days" within which "to take discovery of absent class members and relevant nonparties (e.g., Watson / Actavis / Teva) regarding any obligations on the part of such absent class members to resolve disputes with Watson / Teva / Actavis in any forum other than this Court, including any obligation to resolve disputes by arbitration, mediation, or other means of [alternative dispute resolution] ADR." [ECF No. 645 at 1–2]. Shire argues that, though discovery of absent class members is generally disfavored, the factors courts consider in this context favor granting Shire's request. [ECF No. 646-1]. The DPPs respond that Shire's motion "comes too late" and seeks documents that it could have sought from former co-defendant Actavis years ago; that the Court has already resolved the question of class certification; and, even if Shire's request for discovery is granted, Shire has waived its right to enforce any Actavis arbitration agreements. [ECF No. 651 at 7]. Shire in turn argues that its motion is timely, there is no requirement it seek documents from non-party Actavis, the Court has an ongoing obligation to ensure the requirements for class

certification have been met, and it has not waived its rights to arbitration under these agreements. See [ECF No. 655].

As the Court has noted, after a class is certified, discovery as to absent class members is "generally inappropriate." [ECF No. 554 at 20 (quoting Jubinville v. Hill's Pet Nutrition, Inc., No. 19-cv-00074, 2019 WL 1584679, at *10 (D.R.I. Apr. 12, 2019))]; see also In re Porsche Automobil Holding SE, No. 20-1239, 2021 WL 140638 (1st Cir. Jan. 15, 2021) ("[C]ourts should be attentive to the possibility of abuse when discovery is targeted directly or indirectly at passive class members." (citing 3 William B. Rubenstein, Newberg on Class Actions § 9:11 (5th ed. 2020))). This principle "applies after the class has been certified to avoid discovery that 'may defeat the purpose of certifying the class in the first place.'" Jubinville, 2019 WL 1584679, at *10 (quoting McPhail v. First Command Fin. Planning, Inc., 251 F.R.D. 514, 517 (S.D. Cal. 2008)). This is because "a defendant who propounds discovery upon absent class members requires those members to take some affirmative action to remain in the class, 'effectively creating an "opt in" requirement which is inconsistent with the "opt out" provisions of Rule 23.'" McPhail, 251 F.R.D. at 517 (citation omitted).

That said, "courts [have] allow[ed] discovery from absent class members in actions under Federal Rule of Civil Procedure 23 . . . after considering multiple factors, including whether the defendant has a good faith purpose and whether the request is unduly burdensome." In re Porsche, 2021 WL 140638 (citing Newberg on Class Actions § 9:11–13); see also Newberg on Class Actions § 9:15. Another session of this court recently articulated the following factors as relevant to this analysis: whether discovery "(1) is needed for the purposes of trial or the issues common to the class, (2) is narrowly tailored, (3) will impose undue burden on the absent class members, and (4) is not available from representative plaintiffs." Briggs v. Mass. Dep't of Corr.,

No. 15-cv-40162, 2022 WL 16702402, at *1 (D. Mass. Oct. 20, 2022) (quoting <u>Fishon v. Peloton Interactive, Inc.</u>, 336 F.R.D. 67, 70–71 (S.D.N.Y. 2020)).  The parties appear to agree on this standard.  <u>See</u> [ECF No. 646 at 14; ECF No. 651 at 16].  The Court finds that the information Shire seeks is necessary to evaluate the continuing viability of the class and thus "is needed for the purposes of trial or the issues common to the class," the other criteria articulated in <u>Briggs</u> are satisfied, and whether or not former defendant Actavis has this information is not relevant to this analysis.  Finally, at this stage, before it is clear whether there are additional related arbitration agreements,  the Court declines to rule on waiver.  Accordingly, Shire's motion is <u>GRANTED</u>.

IV.    **CONCLUSION**

For the foregoing reasons, DPPs RDC and BI-LO's Motion to Be Appointed Class Representatives, [ECF No. 638], is <u>DENIED</u>; Shire's Motion for Absent Class Member Discovery, [ECF No. 645], is <u>GRANTED</u>; and Shire's Motion to Compel, [ECF No. 665], is <u>GRANTED</u> in part and <u>DENIED</u> in part.  BI-LO's claims are <u>STAYED</u>.  Should BI-LO wish to proceed, it must submit its claims to an arbitrator, as required by the RPA and GPPA, for a decision as to arbitrability.

The Court is aware that concluding that more arbitration is required and disallowing RDC from being the sole representative will be costly, and cause further delay in getting this case to trial to reach a long-awaited resolution for the direct purchasers.  Nonetheless, consistent with precedent and the Court's previous rulings in this case, it seems clear that BI-LO must arbitrate and equally clear that a liquidating trust, with a mandate to liquidate is not alone an adequate representative, particularly when there may be other options for a co-class representative.  It remains the intention of the Court to try this case and it will continue to do its utmost to get the

case to that point.  That said, as with any case, the Court encourages the parties, in the interests of all concerned, to think about alternate paths to resolve this matter in the nearer term.

**SO ORDERED.**

January 22, 2024                                                    /s/ Allison D. Burroughs
                                                                              ALLISON D. BURROUGHS
                                                                              U.S. DISTRICT JUDGE